# QUALITEX CO. *v.* JACOBSON PRODUCTS CO., INC.

No. 93–1577.  Argued January 9, 1995—Decided March 28, 1995

BREYER, J., delivered the opinion for a unanimous Court.

*Donald G. Mulack* argued the cause for petitioner. With him on the briefs were *Christopher A. Bloom, Edward J. Chalfie, Heather C. Steinmeyer,* and *Ava B. Campagna.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Assistant Attorneys General Hunger* and *Bingaman, Diane P. Wood, James A. Feldman, William Kanter, Marc Richman, Nancy J. Linck, Albin F. Drost, Nancy C. Slutter,* and *Linda Moncys Isacson.*

*Laurence D. Strick* argued the cause and filed a brief for respondent.*

JUSTICE BREYER delivered the opinion of the Court.

The question in this case is whether the Trademark Act of 1946 (Lanham Act), 15 U. S. C. §§ 1051–1127 (1988 ed. and Supp. V), permits the registration of a trademark that con-

---

*Briefs of *amici curiae* urging reversal were filed for the Bar Association of the District of Columbia by *Bruce T. Wieder, Sheldon H. Klein,* and *Linda S. Paine-Powell;* for B. F. Goodrich Co. by *Lawrence S. Robbins* and *Mary Ann Tucker;* for the Crosby Group, Inc., by *Robert D. Yeager;* for Dr Pepper/Seven-Up Corp. by *David C. Gryce;* for the Hand Tools Institute et al. by *James E. Siegel, Witold A. Ziarno,* and *Rosemarie Biondi-Tofano;* for Intellectual Property Owners by *George R. Powers, Neil A. Smith,* and *Herbert C. Wamsley;* for the International Trademark Association by *Christopher C. Larkin, Joan L. Dillon,* and *Morton David Goldberg;* and for Owens-Corning Fiberglas Corp. by *Michael W. Schwartz* and *Marc Wolinsky.*

*Arthur M. Handler* filed a brief for the Private Label Manufacturers Association as *amicus curiae* urging affirmance.

sists, purely and simply, of a color. We conclude that, sometimes, a color will meet ordinary legal trademark requirements. And, when it does so, no special legal rule prevents color alone from serving as a trademark.

## I

The case before us grows out of petitioner Qualitex Company's use (since the 1950's) of a special shade of green-gold color on the pads that it makes and sells to dry cleaning firms for use on dry cleaning presses. In 1989, respondent Jacobson Products (a Qualitex rival) began to sell its own press pads to dry cleaning firms; and it colored those pads a similar green gold. In 1991, Qualitex registered the special green-gold color on press pads with the Patent and Trademark Office as a trademark. Registration No. 1,633,711 (Feb. 5, 1991). Qualitex subsequently added a trademark infringement count, 15 U. S. C. § 1114(1), to an unfair competition claim, § 1125(a), in a lawsuit it had already filed challenging Jacobson's use of the green-gold color.

Qualitex won the lawsuit in the District Court. 21 U. S. P. Q. 2d 1457 (CD Cal. 1991). But, the Court of Appeals for the Ninth Circuit set aside the judgment in Qualitex's favor on the trademark infringement claim because, in that Circuit's view, the Lanham Act does not permit Qualitex, or anyone else, to register "color alone" as a trademark. 13 F. 3d 1297, 1300, 1302 (1994).

The Courts of Appeals have differed as to whether or not the law recognizes the use of color alone as a trademark. Compare *NutraSweet Co.* v. *Stadt Corp.*, 917 F. 2d 1024, 1028 (CA7 1990) (absolute prohibition against protection of color alone), with *In re Owens-Corning Fiberglas Corp.*, 774 F. 2d 1116, 1128 (CA Fed. 1985) (allowing registration of color pink for fiberglass insulation), and *Master Distributors, Inc.* v. *Pako Corp.*, 986 F. 2d 219, 224 (CA8 1993) (declining to establish *per se* prohibition against protecting color alone as a trademark). Therefore, this Court granted certiorari. 512

U. S. 1287 (1994). We now hold that there is no rule absolutely barring the use of color alone, and we reverse the judgment of the Ninth Circuit.

## II

The Lanham Act gives a seller or producer the exclusive right to "register" a trademark, 15 U. S. C. § 1052 (1988 ed. and Supp. V), and to prevent his or her competitors from using that trademark, § 1114(1). Both the language of the Act and the basic underlying principles of trademark law would seem to include color within the universe of things that can qualify as a trademark. The language of the Lanham Act describes that universe in the broadest of terms. It says that trademarks "includ[e] any word, name, symbol, or device, or any combination thereof." § 1127. Since human beings might use as a "symbol" or "device" almost anything at all that is capable of carrying meaning, this language, read literally, is not restrictive. The courts and the Patent and Trademark Office have authorized for use as a mark a particular shape (of a Coca-Cola bottle), a particular sound (of NBC's three chimes), and even a particular scent (of plumeria blossoms on sewing thread). See, e. g., Registration No. 696,147 (Apr. 12, 1960); Registration Nos. 523,616 (Apr. 4, 1950) and 916,522 (July 13, 1971); In re Clarke, 17 U. S. P. Q. 2d 1238, 1240 (TTAB 1990). If a shape, a sound, and a fragrance can act as symbols why, one might ask, can a color not do the same?

A color is also capable of satisfying the more important part of the statutory definition of a trademark, which requires that a person "us[e]" or "inten[d] to use" the mark

> "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U. S. C. § 1127.

True, a product's color is unlike "fanciful," "arbitrary," or "suggestive" words or designs, which almost *automatically*

tell a customer that they refer to a brand. *Abercrombie & Fitch Co.* v. *Hunting World, Inc.*, 537 F. 2d 4, 9–10 (CA2 1976) (Friendly, J.); see *Two Pesos, Inc.* v. *Taco Cabana, Inc.*, 505 U. S. 763, 768 (1992). The imaginary word "Suntost," or the words "Suntost Marmalade," on a jar of orange jam immediately would signal a brand or a product "source"; the jam's orange color does not do so. But, over time, customers may come to treat a particular color on a product or its packaging (say, a color that in context seems unusual, such as pink on a firm's insulating material or red on the head of a large industrial bolt) as signifying a brand. And, if so, that color would have come to identify and distinguish the goods—*i. e.*, "to indicate" their "source"—much in the way that descriptive words on a product (say, "Trim" on nail clippers or "Car-Freshner" on deodorizer) can come to indicate a product's origin. See, *e. g., J. Wiss & Sons Co.* v. *W. E. Bassett Co.*, 59 C. C. P. A. 1269, 1271 (Pat.), 462 F. 2d 567, 569 (1972); *Car-Freshner Corp.* v. *Turtle Wax, Inc.*, 268 F. Supp. 162, 164 (SDNY 1967). In this circumstance, trademark law says that the word (*e. g.*, "Trim"), although not inherently distinctive, has developed "secondary meaning." See *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U. S. 844, 851, n. 11 (1982) ("[S]econdary meaning" is acquired when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself"). Again, one might ask, if trademark law permits a descriptive word with secondary meaning to act as a mark, why would it not permit a color, under similar circumstances, to do the same?

We cannot find in the basic objectives of trademark law any obvious theoretical objection to the use of color alone as a trademark, where that color has attained "secondary meaning" and therefore identifies and distinguishes a particular brand (and thus indicates its "source"). In principle, trademark law, by preventing others from copying a source-identifying mark, "reduce[s] the customer's costs of shopping

and making purchasing decisions," 1 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 2.01[2], p. 2–3 (3d ed. 1994) (hereinafter McCarthy), for it quickly and easily assures a potential customer that *this* item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past. At the same time, the law helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product. The law thereby "encourage[s] the production of quality products," *ibid.*, and simultaneously discourages those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale. See, *e. g.*, 3 L. Altman, Callmann on Unfair Competition, Trademarks and Monopolies § 17.03 (4th ed. 1983); Landes & Posner, The Economics of Trademark Law, 78 T. M. Rep. 267, 271–272 (1988); *Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.*, 469 U. S. 189, 198 (1985); S. Rep. No. 100–515, p. 4 (1988). It is the source-distinguishing ability of a mark—not its ontological status as color, shape, fragrance, word, or sign—that permits it to serve these basic purposes. See Landes & Posner, Trademark Law: An Economic Perspective, 30 J. Law & Econ. 265, 290 (1987). And, for that reason, it is difficult to find, in basic trademark objectives, a reason to disqualify absolutely the use of a color as a mark.

Neither can we find a principled objection to the use of color as a mark in the important "functionality" doctrine of trademark law. The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, 35 U. S. C. §§ 154, 173, after which competitors are free to use the innovation. If a product's functional features could be

used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity). See *Kellogg Co.* v. *National Biscuit Co.*, 305 U. S. 111, 119–120 (1938) (Brandeis, J.); *Inwood Laboratories, Inc.*, *supra*, at 863 (White, J., concurring in result) ("A functional characteristic is 'an important ingredient in the commercial success of the product,' and, after expiration of a patent, it is no more the property of the originator than the product itself") (citation omitted). Functionality doctrine therefore would require, to take an imaginary example, that even if customers have come to identify the special illumination-enhancing shape of a new patented light bulb with a particular manufacturer, the manufacturer may not use that shape as a trademark, for doing so, after the patent had expired, would impede competition—not by protecting the reputation of the original bulb maker, but by frustrating competitors' legitimate efforts to produce an equivalent illumination-enhancing bulb. See, *e. g.*, *Kellogg Co.*, *supra*, at 119–120 (trademark law cannot be used to extend monopoly over "pillow" shape of shredded wheat biscuit after the patent for that shape had expired). This Court consequently has explained that, "[i]n general terms, a product feature is functional," and cannot serve as a trademark, "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article," that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage. *Inwood Laboratories, Inc.*, *supra*, at 850, n. 10. Although sometimes color plays an important role (unrelated to source identification) in making a product more desirable, sometimes it does not. And, this latter fact—the fact that sometimes color is not essential to a product's use or purpose and does not affect cost or quality—indicates that the doctrine of "functionality" does not create an absolute bar to the use of color alone as a mark. See *Owens-Corning*, 774 F. 2d, at 1123 (pink color of insulation in wall "performs no non-trademark function").

It would seem, then, that color alone, at least sometimes, can meet the basic legal requirements for use as a trademark. It can act as a symbol that distinguishes a firm's goods and identifies their source, without serving any other significant function. See U. S. Dept. of Commerce, Patent and Trademark Office, Trademark Manual of Examining Procedure § 1202.04(e), p. 1202–13 (2d ed. May, 1993) (hereinafter PTO Manual) (approving trademark registration of color alone where it "has become distinctive of the applicant's goods in commerce," provided that "there is [no] competitive need for colors to remain available in the industry" and the color is not "functional"); see also 1 McCarthy §§ 3.01[1], 7.26, pp. 3–2, 7–113 ("requirements for qualification of a word or symbol as a trademark" are that it be (1) a "symbol," (2) "use[d] . . . as a mark," (3) "to identify and distinguish the seller's goods from goods made or sold by others," but that it not be "functional"). Indeed, the District Court, in this case, entered findings (accepted by the Ninth Circuit) that show Qualitex's green-gold press pad color has met these requirements. The green-gold color acts as a symbol. Having developed secondary meaning (for customers identified the green-gold color as Qualitex's), it identifies the press pads' source. And, the green-gold color serves no other function. (Although it is important to use *some* color on press pads to avoid noticeable stains, the court found "no competitive need in the press pad industry for the green-gold color, since other colors are equally usable." 21 U. S. P. Q. 2d, at 1460.) Accordingly, unless there is some special reason that convincingly militates against the use of color alone as a trademark, trademark law would protect Qualitex's use of the green-gold color on its press pads.

### III

Respondent Jacobson Products says that there are four special reasons why the law should forbid the use of color

alone as a trademark. We shall explain, in turn, why we, ultimately, find them unpersuasive.

*First*, Jacobson says that, if the law permits the use of color as a trademark, it will produce uncertainty and unresolvable court disputes about what shades of a color a competitor may lawfully use. Because lighting (morning sun, twilight mist) will affect perceptions of protected color, competitors and courts will suffer from "shade confusion" as they try to decide whether use of a similar color on a similar product does, or does not, confuse customers and thereby infringe a trademark. Jacobson adds that the "shade confusion" problem is "more difficult" and "far different from" the "determination of the similarity of words or symbols." Brief for Respondent 22.

We do not believe, however, that color, in this respect, is special. Courts traditionally decide quite difficult questions about whether two words or phrases or symbols are sufficiently similar, in context, to confuse buyers. They have had to compare, for example, such words as "Bonamine" and "Dramamine" (motion-sickness remedies); "Huggies" and "Dougies" (diapers); "Cheracol" and "Syrocol" (cough syrup); "Cyclone" and "Tornado" (wire fences); and "Mattres" and "1–800–Mattres" (mattress franchisor telephone numbers). See, *e. g., G. D. Searle & Co.* v. *Chas. Pfizer & Co.,* 265 F. 2d 385, 389 (CA7 1959); *Kimberly-Clark Corp.* v. *H. Douglas Enterprises, Ltd.,* 774 F. 2d 1144, 1146–1147 (CA Fed. 1985); *Upjohn Co.* v. *Schwartz,* 246 F. 2d 254, 262 (CA2 1957); *Hancock* v. *American Steel & Wire Co. of N. J.,* 40 C. C. P. A. (Pat.) 931, 935, 203 F. 2d 737, 740–741 (1953); *Dial-A-Mattress Franchise Corp.* v. *Page,* 880 F. 2d 675, 678 (CA2 1989). Legal standards exist to guide courts in making such comparisons. See, *e. g.,* 2 McCarthy § 15.08; 1 McCarthy §§ 11.24–11.25 ("[S]trong" marks, with greater secondary meaning, receive broader protection than "weak" marks). We do not see why courts could not apply those standards to a color, replicating, if necessary, lighting conditions under

which a colored product is normally sold.    See Ebert, Trademark Protection in Color: Do It By the Numbers!, 84 T. M. Rep. 379, 405 (1994).    Indeed, courts already have done so in cases where a trademark consists of a color plus a design, *i. e.*, a colored symbol such as a gold stripe (around a sewer pipe), a yellow strand of wire rope, or a "brilliant yellow" band (on ampules).    See, *e. g., Youngstown Sheet & Tube Co.* v. *Tallman Conduit Co.*, 149 U. S. P. Q. 656, 657 (TTAB 1966); *Amstead Industries, Inc.* v. *West Coast Wire Rope & Rigging Inc.*, 2 U. S. P. Q. 2d 1755, 1760 (TTAB 1987); *In re Hodes-Lange Corp.*, 167 U. S. P. Q. 255, 256 (TTAB 1970).

*Second,* Jacobson argues, as have others, that colors are in limited supply.    See, *e. g., NutraSweet Co.*, 917 F. 2d, at 1028; *Campbell Soup Co.* v. *Armour & Co.*, 175 F. 2d 795, 798 (CA3 1949).    Jacobson claims that, if one of many competitors can appropriate a particular color for use as a trademark, and each competitor then tries to do the same, the supply of colors will soon be depleted.    Put in its strongest form, this argument would concede that "[h]undreds of color pigments are manufactured and thousands of colors can be obtained by mixing."    L. Cheskin, Colors: What They Can Do For You 47 (1947).    But, it would add that, in the context of a particular product, only some colors are usable.    By the time one discards colors that, say, for reasons of customer appeal, are not usable, and adds the shades that competitors cannot use lest they risk infringing a similar, registered shade, then one is left with only a handful of possible colors.    And, under these circumstances, to permit one, or a few, producers to use colors as trademarks will "deplete" the supply of usable colors to the point where a competitor's inability to find a suitable color will put that competitor at a significant disadvantage.

This argument is unpersuasive, however, largely because it relies on an occasional problem to justify a blanket prohibition.    When a color serves as a mark, normally alternative colors will likely be available for similar use by others.    See, *e. g., Owens-Corning,* 774 F. 2d, at 1121 (pink insulation).

Moreover, if that is not so—if a "color depletion" or "color scarcity" problem does arise—the trademark doctrine of "functionality" normally would seem available to prevent the anticompetitive consequences that Jacobson's argument posits, thereby minimizing that argument's practical force.

The functionality doctrine, as we have said, forbids the use of a product's feature as a trademark where doing so will put a competitor at a significant disadvantage because the feature is "essential to the use or purpose of the article" or "affects [its] cost or quality." *Inwood Laboratories, Inc.*, 456 U. S., at 850, n. 10. The functionality doctrine thus protects competitors against a disadvantage (unrelated to recognition or reputation) that trademark protection might otherwise impose, namely, their inability reasonably to replicate important non-reputation-related product features. For example, this Court has written that competitors might be free to copy the color of a medical pill where that color serves to identify the kind of medication (*e. g.*, a type of blood medicine) in addition to its source. See *id.*, at 853, 858, n. 20 ("[S]ome patients commingle medications in a container and rely on color to differentiate one from another"); see also J. Ginsburg, D. Goldberg, & A. Greenbaum, Trademark and Unfair Competition Law 194–195 (1991) (noting that drug color cases "have more to do with public health policy" regarding generic drug substitution "than with trademark law"). And, the federal courts have demonstrated that they can apply this doctrine in a careful and reasoned manner, with sensitivity to the effect on competition. Although we need not comment on the merits of specific cases, we note that lower courts have permitted competitors to copy the green color of farm machinery (because customers wanted their farm equipment to match) and have barred the use of black as a trademark on outboard boat motors (because black has the special functional attributes of decreasing the apparent size of the motor and ensuring compatibility with many different boat colors). See *Deere & Co.* v. *Farmhand, Inc.*, 560

F. Supp. 85, 98 (SD Iowa 1982), aff'd, 721 F. 2d 253 (CA8 1983); *Brunswick Corp.* v. *British Seagull Ltd.,* 35 F. 3d 1527, 1532 (CA Fed. 1994), cert. pending, No. 94–1075; see also *Nor-Am Chemical* v. *O. M. Scott & Sons Co.,* 4 U. S. P. Q. 2d 1316, 1320 (ED Pa. 1987) (blue color of fertilizer held functional because it indicated the presence of nitrogen). The Restatement (Third) of Unfair Competition adds that, if a design's "aesthetic value" lies in its ability to "confe[r] a significant benefit that cannot practically be duplicated by the use of alternative designs," then the design is "functional." Restatement (Third) of Unfair Competition § 17, Comment *c,* pp. 175–176 (1993). The "ultimate test of aesthetic functionality," it explains, "is whether the recognition of trademark rights would significantly hinder competition." *Id.,* at 176.

The upshot is that, where a color serves a significant non-trademark function—whether to distinguish a heart pill from a digestive medicine or to satisfy the "noble instinct for giving the right touch of beauty to common and necessary things," G. Chesterton, Simplicity and Tolstoy 61 (1912)—courts will examine whether its use as a mark would permit one competitor (or a group) to interfere with legitimate (nontrademark-related) competition through actual or potential exclusive use of an important product ingredient. That examination should not discourage firms from creating esthetically pleasing mark designs, for it is open to their competitors to do the same. See, *e. g., W. T. Rogers Co.* v. *Keene,* 778 F. 2d 334, 343 (CA7 1985) (Posner, J.). But, ordinarily, it should prevent the anticompetitive consequences of Jacobson's hypothetical "color depletion" argument, when, and if, the circumstances of a particular case threaten "color depletion."

*Third,* Jacobson points to many older cases—including Supreme Court cases—in support of its position. In 1878, this Court described the common-law definition of trademark rather broadly to "consist of a name, symbol, figure, letter, form, or device, if adopted and used by a manufacturer or

merchant in order to designate the goods he manufactures or sells to distinguish the same from those manufactured or sold by another." *McLean* v. *Fleming*, 96 U. S. 245, 254. Yet, in interpreting the Trademark Acts of 1881 and 1905, 21 Stat. 502, 33 Stat. 724, which retained that common-law definition, the Court questioned "[w]hether mere color can constitute a valid trade-mark," *A. Leschen & Sons Rope Co.* v. *Broderick & Bascom Rope Co.*, 201 U. S. 166, 171 (1906), and suggested that the "product including the coloring matter is free to all who make it," *Coca-Cola Co.* v. *Koke Co. of America*, 254 U. S. 143, 147 (1920). Even though these statements amounted to dicta, lower courts interpreted them as forbidding protection for color alone. See, *e. g., Campbell Soup Co.*, 175 F. 2d, at 798, and n. 9; *Life Savers Corp.* v. *Curtiss Candy Co.*, 182 F. 2d 4, 9 (CA7 1950) (quoting *Campbell Soup, supra,* at 798).

These Supreme Court cases, however, interpreted trademark law as it existed *before* 1946, when Congress enacted the Lanham Act. The Lanham Act significantly changed and liberalized the common law to "dispense with mere technical prohibitions," S. Rep. No. 1333, 79th Cong., 2d Sess., 3 (1946), most notably, by permitting trademark registration of descriptive words (say, "U-Build-It" model airplanes) where they had acquired "secondary meaning." See *Abercrombie & Fitch Co.*, 537 F. 2d, at 9 (Friendly, J.). The Lanham Act extended protection to descriptive marks by making clear that (with certain explicit exceptions not relevant here)

> "nothing . . . shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce." 15 U. S. C. § 1052(f) (1988 ed., Supp. V).

This language permits an ordinary word, normally used for a nontrademark purpose (*e. g.,* description), to act as a trademark where it has gained "secondary meaning." Its logic

would appear to apply to color as well. Indeed, in 1985, the Federal Circuit considered the significance of the Lanham Act's changes as they related to color and held that trademark protection for color was consistent with the

> "jurisprudence under the Lanham Act developed in accordance with the statutory principle that if a mark is capable of being or becoming distinctive of [the] applicant's goods in commerce, then it is capable of serving as a trademark." *Owens-Corning*, 774 F. 2d, at 1120.

In 1988, Congress amended the Lanham Act, revising portions of the definitional language, but left unchanged the language here relevant. § 134, 102 Stat. 3946, 15 U. S. C. § 1127. It enacted these amendments against the following background: (1) the Federal Circuit had decided *Owens-Corning;* (2) the Patent and Trademark Office had adopted a clear policy (which it still maintains) permitting registration of color as a trademark, see PTO Manual § 1202.04(e) (at p. 1200–12 of the January 1986 edition and p. 1202–13 of the May 1993 edition); and (3) the Trademark Commission had written a report, which recommended that "the terms 'symbol, or device' . . . not be deleted or narrowed to preclude registration of such things as a color, shape, smell, sound, or configuration which functions as a mark," The United States Trademark Association Trademark Review Commission Report and Recommendations to USTA President and Board of Directors, 77 T. M. Rep. 375, 421 (1987); see also 133 Cong. Rec. 32812 (1987) (statement of Sen. DeConcini) ("The bill I am introducing today is based on the Commission's report and recommendations"). This background strongly suggests that the language "any word, name, symbol, or device," 15 U. S. C. § 1127, had come to include color. And, when it amended the statute, Congress retained these terms. Indeed, the Senate Report accompanying the Lanham Act revision explicitly referred to this background understanding, in saying that the "revised definition intentionally retains . . .

the words 'symbol or device' so as not to preclude the registration of colors, shapes, sounds or configurations where they function as trademarks." S. Rep. No. 100–515, at 44. (In addition, the statute retained language providing that "[n]o trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration . . . on account of its nature" (except for certain specified reasons not relevant here). 15 U. S. C. § 1052 (1988 ed., Supp. V).)

This history undercuts the authority of the precedent on which Jacobson relies. Much of the pre-1985 case law rested on statements in Supreme Court opinions that interpreted pre-Lanham Act trademark law and were not directly related to the holdings in those cases. Moreover, we believe the Federal Circuit was right in 1985 when it found that the 1946 Lanham Act embodied crucial legal changes that liberalized the law to permit the use of color alone as a trademark (under appropriate circumstances). At a minimum, the Lanham Act's changes left the courts free to reevaluate the preexisting legal precedent which had absolutely forbidden the use of color alone as a trademark. Finally, when Congress reenacted the terms "word, name, symbol, or device" in 1988, it did so against a legal background in which those terms had come to include color, and its statutory revision embraced that understanding.

*Fourth,* Jacobson argues that there is no need to permit color alone to function as a trademark because a firm already may use color as part of a trademark, say, as a colored circle or colored letter or colored word, and may rely upon "trade dress" protection, under § 43(a) of the Lanham Act, if a competitor copies its color and thereby causes consumer confusion regarding the overall appearance of the competing products or their packaging, see 15 U. S. C. § 1125(a) (1988 ed., Supp. V). The first part of this argument begs the question. One can understand why a firm might find it difficult to place a usable symbol or word on a product (say, a large industrial

bolt that customers normally see from a distance); and, in such instances, a firm might want to use color, pure and simple, instead of color as part of a design. Neither is the second portion of the argument convincing. Trademark law helps the holder of a mark in many ways that "trade dress" protection does not. See 15 U. S. C. § 1124 (ability to prevent importation of confusingly similar goods); § 1072 (constructive notice of ownership); § 1065 (incontestible status); § 1057(b) (prima facie evidence of validity and ownership). Thus, one can easily find reasons why the law might provide trademark protection in addition to trade dress protection.

## IV

Having determined that a color may sometimes meet the basic legal requirements for use as a trademark and that respondent Jacobson's arguments do not justify a special legal rule preventing color alone from serving as a trademark (and, in light of the District Court's here undisputed findings that Qualitex's use of the green-gold color on its press pads meets the basic trademark requirements), we conclude that the Ninth Circuit erred in barring Qualitex's use of color as a trademark. For these reasons, the judgment of the Ninth Circuit is

*Reversed.*