NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0219n.06
Filed: March 23, 2009

No. 08-3330

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| KERR CORPORATION, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| FREEMAN MANUFACTURING & SUPPLY | ) | THE NORTHERN DISTRICT OF |
| COMPANY, | ) | OHIO |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

Before: MOORE, CLAY, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. Kerr Corporation (Kerr) appeals the grant of summary judgment to Freeman Manufacturing & Supply Company (Freeman) on its breach-of-contract and trademark-infringement claims. We reverse.

I.

A.

Kerr and Freeman both manufacture and sell jewelry injection waxes. In the late 1970s, Freeman began manufacturing waxes for Kerr, which then sold them to end-users. In 1984, Kerr and Freeman entered into a "Development Agreement," under which Freeman agreed to develop new waxes for Kerr. The Agreement provided:

> FREEMAN agrees to use its best efforts to provide design, development and consultation services to KERR as described in projects to be proposed by KERR of and relating to the development of Wax Technology. Such projects including project expenditures, time schedules and objectives will be prepared in writing by KERR, approved by FREEMAN, and made a part hereof.

J.A. 82. The Agreement further provided that "[a]ll know-how, inventions, improvements or discoveries, patentable or otherwise, if any, arising out of the work performed under this Agreement (collectively 'New Technology') shall be the exclusive property of KERR." J.A. 83.

Prior to 1987, Freeman developed and manufactured waxes for several other distributors in addition to Kerr, and also sold waxes directly to end-users. In 1987, however, Kerr and Freeman entered into an exclusive "Distributorship Agreement," under which Freeman agreed to manufacture waxes solely for Kerr.

Between 1984 and 2004, Kerr paid Freeman approximately $380,000 for its services under the Agreement. Kerr claims that, in exchange, Freeman developed a number of waxes for Kerr, including an "inlay dental wax"; a flexible wax named "Flex-Plast"; a low-cost "Pearls" wax; and a carvable injection wax named "ACCU®Carve."

Kerr alleges that it initiated the inlay-dental-wax and Flex-Plast projects by oral request to Freeman. In any event, Freeman developed the inlay dental wax in 1985 and gave the wax's formula to Kerr. Freeman finalized the Flex-Plast wax in 1990, which Kerr sold under that name. Kerr contends, however, that Freeman did not turn the Flex-Plast formula over to Kerr.

Kerr claims it initiated the Pearls project by writing a letter to Freeman in 1996. In the letter, Kerr asked Freeman to develop a "second line of lower cost wax than what you are currently unable [sic] to supply for us." J.A. 434. Kerr requested that the new wax achieve a ".15 to .20 cent [per-

pound] savings" over the existing wax. *Id.* Freeman wrote a response letter to Kerr, in which it referenced the retainer fee Freeman was to receive under the Development Agreement. J.A. 433. The following year, Freeman stated in a quarterly report that "[a]fter an extensive development on a pink flexible economy wax . . . lab color samples for the Jewelry wax pearls . . . were sent to Kerr for final selection and approval." J.A. 444. Freeman also wrote in a letter that, "[d]uring the past year, Freeman and Kerr have accomplished a great deal by working closely together in developing the 'Pearls[.]'" J.A. 442.

Kerr likewise claims it initiated the ACCU®Carve project by sending a letter to Freeman. On April 3, 1998, Kerr wrote that it was "interested in starting two new projects with Freeman[,]" including a "'carvable injection' wax" that was "harder and less gummy" than its existing waxes. J.A. 443. Freeman responded, noting that the requested wax "appear[s] to be very similar to existing Jewelry Wax formulations we have successfully manufactured *exclusively* for Kerr for over ten (10) years." J.A. 442 (emphasis in original). It stated that it was "proceeding with [its] initial evaluation of the 'carvable injection wax'" and requested a "target purchase price" for that wax. *Id.*

Freeman denies, however, that it developed the Flex-Plast, Pearls, or ACCU®Carve waxes "under" the Agreement. Freeman concedes that it developed the inlay dental wax under the Agreement, and complied with the Agreement by giving Kerr the wax's formula. It asserts that it developed the wax without a written proposal, however, as a "favor" to Kerr. J.A. 630.

Kerr initially sold its waxes in both "brick" and "flake" form. By 2001, it was selling its waxes only in "flake" form. At that time, it applied for, and received, trademark registration for its "Flakes" mark. Kerr sold the waxes in eight colors under the following names: "Aqua Green

Flakes," "Ruby Red Flakes," "Turquoise Flakes," "NYC Pink Flakes," "Tuffy Green Flakes," "Super Pink Flakes," "Flex-Plast Flakes," and "ACCUCarve." Kerr claims it spent over $600,000 advertising and marketing these waxes.

In 2004, Kerr and Freeman terminated the exclusive Distribution Agreement. Thereafter, Freeman began (or, according to Freeman, resumed) marketing and selling waxes to other distributors and end-users using the same wax formulas, colors, names, and flake form used by Kerr. In February 2005, Freeman's president, Lou Turco, sent a "clarification" letter to all major wax distributors and purchasers, informing them that "Freeman ha[d] not sold or licensed its formulas or manufacturing processes to Kerr Corporation[,]" and that "[t]he eight flake wax formulations that were sold under the ACCU®-Flakes brand name through January 2005 are now manufactured and sold exclusively under the Freeman Flakes™ brand name." J.A. 177. Freeman later changed some of the names under which it sold the waxes—to "Tuf Guy Flakes™," "Filigree Pink Flakes™," "Flexible Blue Flakes™," and "Carvable Purple Flakes"—but has referred to its new waxes as "Formerly Tuffy Green™," "Formerly NYC Pink™," "Formerly Flexplast™," and "Formerly ACCU® Carve™." It has continued to sell waxes named "Ruby Red," "Aqua," "Turquoise," and "Super Pink Flakes™." In marketing materials, Freeman has stated that its waxes are "the exact same formulations, colors and flake shapes that were sold under the Kerr brand for years." J.A. 402.

B.

Kerr sued Freeman in 2005, alleging that Freeman breached the Development Agreement by failing to give Kerr the formulas for the Pearls, ACCU®Carve, and Flex-Plast waxes, and that

Freeman infringed Kerr's trademark rights by using Kerr's wax names, color scheme, flake form, and "Flakes" trademark.

The parties thereafter filed cross-motions for summary judgment. The district court then granted summary judgment to Freeman on all claims except one. That remaining claim was later dismissed. The court also ordered, *sua sponte*, that Kerr's "Flakes" trademark be canceled from the Supplemental Register.

This appeal followed.

## II.

## A.

We review the district court's grant of summary judgment *de novo*. *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 307-08 (6th Cir. 2001). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## B.

Kerr argues that the district court erred in granting summary judgment to Freeman on its breach-of-contract claims. Kerr claims Freeman failed to disclose three wax formulas—Pearls, ACCU®Carve, and Flex-Plast—that "ar[ose] out of work performed under" the Agreement. J.A. 83. Kerr maintains that, pursuant to the Agreement, those formulas—as "New Technology"—are the "exclusive property of" Kerr. *Id.* Freeman counters that Kerr failed to send Freeman written project proposals for those waxes, and that therefore the waxes were not developed "under" the Agreement.

*Id.* Freeman contends that the Agreement's "New Technology" provision thus does not apply, and the waxes do not belong to Kerr. Freeman asserts that it in fact did not develop *any* new waxes for Kerr "under" the Agreement.

Kerr responds that a formal written proposal was not required to bring a wax-development project "under" the Agreement. It argues that, indeed, *all* wax-development services Freeman provided for Kerr were "under" the Agreement, because those were the "*only* services to be provided by Freeman[.]" Kerr's Reply Br. at 8 (emphasis in original). Freeman admits that it received $380,000 from Kerr "under the development agreement[,]" J.A. 634, and thus, Kerr argues, Freeman must have provided wax-development services "under" the Agreement.

Moreover, Kerr produced evidence that it and Freeman acted consistently with the understanding that the Agreement did not require a written proposal to bring a project "under" the Agreement: shortly after the parties entered into the Agreement, Freeman developed an inlay dental wax for Kerr without Kerr's first sending a written proposal. Freeman nonetheless admits that "this dental wax development was done under the terms of the Development Agreement." J.A. 192. Kerr also produced evidence that this was not an isolated occurrence; Freeman's chief chemist testified that Kerr initiated wax-development projects orally "most of the time." J.A. 668. Kerr also argues, in the alternative, that Freeman waived any writing requirement through this same conduct—"by repeatedly undertaking projects for Kerr under the Development Agreement without requiring any writing[.]" Kerr's Br. at 47. Kerr further argues that, at any rate, it did in fact send written proposals for two of the three waxes at issue, the Pearls and ACCU®Carve waxes, to which Freeman responded in writing and referenced the Agreement's payment terms.

Freeman responds in turn that a formal written proposal *was* required to bring a project "under" the Agreement. Turco, Freeman's president, who negotiated and signed the Agreement, testified that "under no circumstances on the face of this Earth" would he have agreed to turn over valuable wax formulas for the relatively small fees Freeman earned from Kerr under the Agreement. J.A. 641-42. Turco claims that Freeman developed the Pearls and ACCU®Carve waxes "off contract," and produced the "inlay dental wax" without a written proposal as a "favor" to Kerr. J.A. 630, 641. Freeman argues that it did not waive the writing provision through this conduct because the Agreement contains a "no-oral-modification clause" precluding such waiver. Freeman further argues that the "casual correspondence" that initiated the Pearls and ACCU®Carve projects did not satisfy the writing provision because it did not include "project expenditures, time schedules and objectives[.]"

We can call this one a draw. About the only thing on which the parties agree is that the Agreement is governed by New York law. And under New York law, "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." *Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191, 193 (N.Y. App. Div. 1995). Here, the Agreement is ambiguous: it is unclear from the face of the Agreement whether the writing provision is a condition precedent to Freeman's obligations, or whether a wax-development project can be "under" the Agreement—and thus subject to the "New Technology" provision—without Kerr's first sending a formal written proposal. The question, then, becomes one of the parties' intent. *Id.* And Kerr

produced evidence that the parties did not intend the writing provision to control whether work was performed "under" the Agreement, and that the parties acted consistently with that understanding.

If the parties indeed intended the writing provision to be a condition precedent to Freeman's obligations, then Freeman may well be right that Kerr's Pearls and ACCU®Carve letters were insufficient to bring the projects "under" the Agreement. Freeman certainly is right that if the provision is a condition precedent, the parties could not waive it through a course of conduct. Under New York law, a "no-oral-modification clause" is not waived unless there is a specific oral agreement to waive it. *See Grandonico v. Consortium Commc'ns Int'l, Inc.*, 566 F. Supp. 1288, 1291 (S.D.N.Y. 1983). And Kerr does not even allege that Kerr and Freeman orally agreed to waive the no-oral-modification clause.

Otherwise, genuine issues of material fact abound with respect to Kerr's breach-of-contract claims. Summary judgment was therefore inappropriate.

C.

Kerr also argues that the district court erred in granting summary judgment on its trademark- and trade-dress infringement claims. Kerr claims that Freeman infringed its rights by using Kerr's wax-color scheme, wax names, and "flake" form after the parties terminated their relationship in 2004.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), protects a product's "trade dress," which "refers to the image and overall appearance of a product . . . [and] embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, intended to make the source of the product distinguishable from another and to promote

its sale." *Herman Miller, Inc.*, 270 F.3d at 308 (internal quotations marks and citation omitted).

"The first step in qualifying trade dress for protection under § 43(a) is proving distinctiveness."

*Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 635 (6th Cir.

2002). A trade dress can be either "inherently distinctive," or a plaintiff can prove distinctiveness

by showing that its dress has "acquired distinctiveness through attachment of secondary meaning,

which occurs when, 'in the minds of the public, the primary significance of a [mark or dress] is to

identify the source of the product rather than the product itself.'" *Id.* (quoting *Inwood Labs., Inc.*

*v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11 (1982)) (alteration in original).

   "Even if a product's trade dress is distinctive, however, an alleged infringer can defeat

Lanham Act protection by showing that the trade dress, or a feature of the trade dress, is functional."

*Fabrication Enters. v. Hygenic Corp.*, 64 F.3d 53, 58 (2d Cir. 1995). "[I]n general terms, a product

feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the

article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would

put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson*

*Prods. Co.*, 514 U.S. 159, 165 (1995) (internal quotation marks omitted).

   Kerr first claims Freeman infringed its trade-dress rights in the "Kerr Color Coding Scheme,"

which Kerr describes as "a set of eight different, unique, and arbitrarily selected colors and names,

each of which is associated with a jewelry injection wax having specific properties[.]" Kerr's Br.

at 49. Kerr alleges that Freeman's use "of that same *set* of colors and names in connection with

waxes having the same properties . . . resulted in infringement." *Id.* (emphasis in original).

Freeman concedes that it has used the exact same set of colors that Kerr uses. It contends, however, that Kerr does not have protectable trade-dress rights in that set of colors because the colors are "functional features" of the wax. The district court agreed, and stated that "some buyers . . . prefer different colors because they offer greater 'readability,' the ability to detect imperfections in wax molding." J.A. 45. The court concluded that "[t]o allow Kerr exclusive use of the handful of basic colors (e.g. bright red, deep blue), which have functional material application, would provide it with an unfair competitive advantage." *Id.*

We respectfully disagree. Kerr produced evidence that the wax colors are not, in fact, functional, and do not affect "readability." Indeed, Freeman's president testified that he "could have made [Freeman's waxes] chartreuse" without changing the waxes' physical properties. J.A. 621. There is testimony that the lightness or darkness of a wax has some impact on its "readability"; but there is no evidence that any specific color, or specific set of colors, provides any functional advantage.

At any rate, whether any particular color provides a functional advantage is largely irrelevant, because Kerr does not claim trade-dress rights in any particular color. Rather, Kerr claims rights only in its overall color *scheme*; that is, in the eight colors, collectively, that it selected for its waxes. Kerr alleges that Freeman's admitted "wholesale copying" of this scheme infringed its rights. Kerr's Br. at 24. Nothing in the record suggests that Kerr's *scheme* is "essential to the purpose of" or "affects the cost or quality of" the waxes. *Qualitex*, 514 U.S. at 165. Moreover, nothing in the record suggests that Freeman would be placed "at a significant non-reputation-related disadvantage" if it were forced to adopt a different scheme. *Id.*; *see Fabrication Enters.*, 64 F.3d at 55 (holding that

exercise-band manufacturer had trade-dress rights in "a series of colors—tan, yellow, red, green, blue, black, silver and gold—which signif[ied], from least resistant to most resistant, the degree of resistance of the particular band"). Kerr's color scheme therefore is not functional; and the district court erred in granting summary judgment on this ground.

Kerr also claims that Freeman infringed its trade-dress rights in its eight wax *names*. For this claim, distinctiveness and functionality are not genuine issues; Kerr's names, such as "NYC Pink Flakes," "Tuffy Green Flakes," and "Flex-Plast Flakes," are exactly the sort of "fanciful, arbitrary, or suggestive words . . . which almost *automatically* tell a customer they refer to a brand." *Qualitex*, 514 U.S. at 162-63. Again, Freeman does not dispute that it used those names; Freeman instead contends that it was permitted to use them because, it says, it actually invented the names and formulas for these waxes prior to the 1984 Development Agreement. But that is a disputed factual issue that precludes summary judgment on this claim.

Kerr next alleges that Freeman infringed its trade-dress rights by selling wax in "flake" form. Kerr produced evidence that the flake form has achieved secondary meaning in the marketplace, such that customers associate the flake form with Kerr. Freeman claims, however, that the flake form is functional and therefore not protected. But Kerr produced evidence that, aside from melting more quickly than brick-form wax (which is the result of the flakes' size, not shape), the flake form does not provide any functional benefits. Kerr argues that Freeman could make its wax in any number of other shapes—such as stars, pellets, or chunks—without its wax being functionally different from Kerr's flakes. Freeman again concedes that it is producing waxes in flake form, but argues it should

not have to choose another shape because it has been producing waxes in flake form since the 1970s. Again, this is a factual dispute that should not have been resolved at summary judgment.

Finally, Kerr argues that the district court abused its discretion in *sua sponte* ordering Kerr's "Flakes" trademark to be canceled from the Supplemental Register. The district court determined that the mark was "generic" and thus ineligible for trademark protection. "A generic term is one that refers to the genus of which the particular product is a species. Generic terms are not registrable, and a registered mark may be canceled at any time on the grounds that it has become generic." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) (internal citation omitted). Here, the relevant genus is jewelry-injection waxes. "Flakes" is not a species of jewelry injection waxes; it is a descriptor of a particular shape of wax. "Flakes" is therefore not a generic term for jewelry injection waxes. The district court thus abused its discretion in canceling Kerr's mark from the Supplemental Register.

For these reasons, the district court's judgment is reversed, and the case remanded for proceedings consistent with this opinion.