Hearing:
December 7, 2005

THIS DISPOSITION IS
CITABLE AS PRECEDENT
OF THE TTAB

Mailed: 6/14/06

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

In re N.V. Organon

_____

Serial No. 76467774

_____

Joan M. McGillycuddy, James E. Rosini, Michelle Mancino
Marsh, and Justin M. Kayal of Kenyon & Kenyon for N.V.
Organon.

Tracy L. Fletcher, Trademark Examining Attorney, Law Office
115 (Tomas V. Vlcek, Managing Attorney).

_____

Before Quinn, Bucher and Drost, Administrative Trademark
Judges.

Opinion by Quinn, Administrative Trademark Judge:

An application was filed by N.V. Organon, a

corporation organized under the laws of The Netherlands, to

register "an orange flavor" as a trademark for

"pharmaceuticals for human use, namely, antidepressants in

quick-dissolving tablets and pills."[1]  No drawing was

---

[1] Application Serial No. 76467774, filed November 18, 2002,
originally based on both Section 1(b) of the Act, alleging a bona
fide intention to use the mark in commerce, and Section 44 of the
Act, claiming a right of priority under Section 44(d).
Applicant, in a paper filed February 25, 2004, deleted the
Section 44 basis, electing to proceed with the application based
solely on an intention to use the mark in commerce.

submitted because an applicant is not required to submit a drawing if the mark consists only of a sound, scent, or other completely non-visual matter.  For these types of marks, the applicant must submit a detailed description of the mark.  Trademark Rule 2.52(e); and TMEP §807.09 (4th ed. 2005).  The examining attorney accepted the following description:  "This trademark application is for an orange flavor."

The examining attorney refused registration on two bases, namely, (i) under Sections 1, 2 and 45 of the Trademark Act, 15 U.S.C. §§1051, 1052 and 1127, on the ground that the matter sought to be registered neither identifies nor distinguishes the goods of applicant from those of others and, thus, does not act as a source identifier; and (ii) under Section 2(e)(5) of the Trademark Act, 15 U.S.C. §1052(e)(5), on the ground that the matter sought to be registered is functional.

When the refusals were made final, applicant appealed. Applicant and the examining attorney submitted briefs.[2]

---

[2] Applicant, for the first time in its appeal brief, referred to two third-party "registrations" for color marks, but gave neither the registration numbers nor any information about the marks and the goods/services listed in the registration(s).  The examining attorney objected to applicant's attempt to introduce this evidence.  Applicant, in its reply brief, "apologizes for a typographical error in its Appeal Brief that resulted in referring to Astra Zeneca trademarks on purple colored pills without providing the registration numbers in its Appeal Brief.

Applicant's counsel and the examining attorney appeared at an oral hearing held before the Board.

## Examining Attorney's Arguments

The examining attorney maintains that the proposed mark consists of nondistinctive matter that does not function as a mark. The examining attorney states that the proposed mark "appears to be incapable of distinguishing the applicant's goods from those of others since the flavor orange is a standard feature of orally administered pharmaceutical products and simply would not be perceived as an indicator of source." (Appeal brief, unnumbered p. 3). According to the examining attorney, orange flavor is a common feature of pharmaceutical products and, in this

---

Applicant was referring to Reg. No. 2806099 and Serial No. 76467774." (Reply Brief, p. 1). Applicant further indicated that it would furnish photocopies of the registration(s) if necessary.

  Initially, we do not understand applicant's reference to application Serial No. 76467774, given that this number identifies its own application involved herein. In any event, Trademark Rule 2.142(d) provides that the evidentiary record in an application should be complete prior to the filing of the ex parte appeal to the Board. Additional evidence filed after appeal normally will not be considered. TBMP §1207.01 (2d ed. rev. 2004). Further, to properly make a third-party registration of record, a copy of the registration, either a copy of the paper USPTO record, or a copy taken from the electronic records of the Office, should be submitted. Mere listings of registrations are not sufficient to make the registrations of record. TBMP §1208.02 (2d ed. rev. 2004). Accordingly, applicant's attempt to introduce the third-party registration(s) is untimely and improper, and this evidence has not been considered in reaching our decision. We hasten to add, however, that even if considered, this evidence, involving a registration for color, clearly does not compel a different result in this appeal.

connection, she submitted numerous excerpts from websites,

including applicant's, as well as excerpts of articles

retrieved from the NEXIS database.  The evidence shows, the

examining attorney contends, that orange flavor is commonly

added to orally-administered pharmaceutical products to

render the products more palatable, thereby increasing

patient compliance, and that orange is a preferred flavor

for these pharmaceuticals.  With respect to the

functionality of the flavor orange, the examining attorney

points to excerpts from applicant's website touting the

advantages of the orange flavor of its pharmaceuticals, and

the examining attorney asserts:

> Thus, the flavor orange is essential to
> the use or purpose of the product or
> affects the cost or quality of the
> product because it is a common favorite
> among consumers and the use of orange
> flavoring makes taking the applicant's
> antidepressant tablet easier.  What's
> more, the applicant's tablets and pills
> are designed to quickly dissolve in the
> mouths of patients who are unable or
> prefer not to swallow pills whole.
> Thus, there exists a practical need for
> the medicine to have an appealing taste
> since the medicine must remain in the
> mouth for a period of time.  The flavor
> orange makes the applicant's
> antidepressants work better because it
> increases the patient's willingness and
> ability to take the prescribed
> medication.  (Appeal Brief, unnumbered
> p. 7).

The examining attorney concludes that the orange flavor gives an orally administered pharmaceutical product a competitive advantage, and that giving applicant exclusive rights to the flavor would place competitors at a substantial competitive disadvantage.

### Applicant's Arguments

Applicant, in urging reversal of the refusals, argues that "[a]lthough flavor as a trademark may be non-traditional, it is certainly entitled to trademark protection as long as it operates as a trademark, just as color and scent are entitled to trademark protection if they operate as a trademark." (Appeal Brief, p. 1). Applicant asserts that its product was successful even before flavoring, and that doctors, when prescribing applicant's antidepressant drug, never consider the issue of palatability of the drug. Applicant recognizes that the orange flavor, by its nature, will add a taste to the drug, but applicant asserts that it "chose and is using their distinctive 'orange flavor' to distinguish its product rather than for its flavor." (Appeal Brief, p. 3). Applicant maintains that its orange flavor does not make the pharmaceutical work better or impact its cost or quality; rather, according to applicant, the orange flavor is fanciful in that the pharmaceutical, with or without the

5

orange flavor, would be prescribed the same, work the same, and cost the same. Applicant also points out that it could have selected alternative flavors such as cherry or grape for its antidepressant. Applicant contends that the function of the product is solely to work as an effective antidepressant in humans, and that the orange flavor does not affect the functionality of applicant's drug. Applicant likens this appeal to cases dealing with colored capsules for pharmaceuticals wherein the color, applicant argues, is not functional in the sense that neither color nor flavor enhances the efficacy or the therapeutic effect of the drugs or aids in the processing thereof.

Applicant also contends that its particular orange flavor is distinctive, that not all orange flavors taste the same, and that applicant's orange flavor is not used by any other pharmaceutical entity; thus, applicant maintains, the examining attorney's evidence showing that the flavor orange has been used in drugs is not relevant to the issue herein concerning whether the specific orange flavor designed by applicant is a source identifier. Applicant states that, to make the specific orange flavor of applicant's product, the orange flavoring ingredients must be added in amounts different from those used in other products. Applicant submits that if one were to sample

each of the orange-flavored pharmaceuticals referred to in the examining attorney's evidence, "one could distinguish the various types of orange flavors and certainly would not find that all the flavors were identical."  (Reply Brief, p. 4).

**The Evidentiary Record**

The record includes the following excerpts of articles retrieved from the NEXIS database offered by the examining attorney which discuss the pharmaceutical industry's practice of adding flavoring and, in many cases, orange flavoring to pharmaceutical products:

> Eliminating the "Yuck" Factor
> Pharmaceutical firms--recognizing that the word yuck was born shortly after the first cave children were given castor oil--have been making strides in the taste department.  With so many over-the-counter medicines on the market, they're pushing flavor perhaps as much as they're pushing a medicine's ability to cure what ails you.  Fruit is in:  orange-flavored, lemon-flavored, cherry flavored.
> (*Los Angeles Times*, February 16, 1993)

> These days, pharmacists can take a bitter pill and turn it into a spoonful of sugar, or cherry, or orange Creamsicle.  Pharmacists can safely flavor prescription and over-the-counter medicines in liquid, powder and pill forms.
> (*Fort Worth Star-Telegram* (TX), February 9, 2002)

Johnson & Johnson Inc., which earned a name as the 'anti-aspirin' company in its years of marketing Tylenol, is repositioning its orange-flavored St. Joseph children's aspirin as a heart medicine for adults.
(*Wall Street Journal*, April 4, 2002)

Jewell-Osco said all 225 of its pharmacies now offer FLAVORx, a prescription flavoring designed to make unpleasant tasting medicine palatable to children and others.  There are more than 40 flavors of FLAVORx, including grape, orange, banana, bubblegum, root beer, blueberry, butterscotch, chocolate, mint, watermelon, peppermint, licorice and lemon, the company said.
(*Chicago Tribune*, April 5, 2001)

Flavored medications are nothing new, but the quality of flavorings is..."Kids wouldn't finish their medicine and parents would give up," Kramm said.  "Normal compliance is about 50 to 55 percent with children. With Flavorx it's about 90 percent."
(*St. Cloud Times* (MN), September 2, 2001)

Palatable Prescriptions.  Pharmacists revive compounding to help kids with bad-tasting medicine.
Some of the renewed interest in improving the taste of children's medications owes to Washington, D.C., pharmacist Kenny Kramm.  Out of the necessity of finding a way to induce his daughter, who suffers a seizure disorder, to take her medications, Kramm took up as his cause celebre creating confections.
(*The Times Union* (Albany, NY), October 17, 2000)

No more icky taste...Taste-ful product makes medicine easier to swallow...The 6-year-old said that Flavorx-flavored medicine would "be cool," and that he would like medicine with orange flavoring--his favorite.
(*The Herald-Sun* (Durham, NC), August 23, 2000)

Annapolis pharmacist Dave Posner used to frequently advise parents how to make medicine palatable without influencing a medicine's potency.  Now, however, he can offer parents a choice of 42 flavors, including orange and bubblegum, that make it easier for his youngest patients to swallow.
(*Capital* (Annapolis, MD), January 14, 1999)

Medicine Needs Good Taste or It Goes to Waste.
"Kids are interested in very strange flavors right now," he says, predicting that the next hip flavor for children's medicine will be something like "blue raspberry," a combination blueberry and raspberry.  Meanwhile, adults lean toward citrus flavors, Zick says. Lemon and orange with honey are big sellers in over-the-counter medicines. Parents who serve on manufacturers' tasting panels often say they want tasty children's medicines so their kids won't bolt when it's time for the next dose.  Adults are seeking efficacy from (their own) medicines.
(*Orlando Sentinel* (FL), November 16, 1993)

Everything old is new again!...The process by which older drugs are tweaked to make them more attractive is called "reformulation."...Bristol-Myer's Squibb's ddl (Videx) has also gone through its share of reformulations.  First the size of the

9

100 mg chewable tablets was decreased
and infused with a more tolerable
mandarin orange flavor.
(*ACRIA Update*, Vol. 10, No. 2, Spring
2001)

The maker reports 70% of patients in a
clinical trial preferred the drug [for
migraine pain] to conventional tablets;
80% liked the orange flavor.
(*Daily News* (NY), July 30, 2001)

The examining attorney also introduced printouts from

applicant's website to show that applicant touts the taste

of its product.  The website states, in pertinent part, the

following:

Depressed patients prefer and are more
likely to take fast-dissolving
antidepressant tablets in preference to
conventional formulations.

Results from a survey show that more
than seven of ten medical professionals
believe that a fast dissolving
antidepressant tablet will improve poor
patient compliance--one of the main
obstacles to the successful treatment
of depression.  And more than half said
that greater discretion of
administration and *pleasant taste were
important advantages over conventional
antidepressant tablets*...Remeron®SolTab
dissolves on the tongue in just a few
seconds, can be taken without water and
has a *pleasant orange taste.*  This
novel formulation, which became
available in the United States 17
months ago, is already proving popular.
(emphasis added).

Poor compliance is a major concern in
the treatment of depression.  Between
30 and 68% of depressed patients

10

discontinue treatment within one month significantly increasing their risk of relapse...Remeron SolTab was introduced by Organon to offer the unique advantages of Remeron in a more patient-acceptable formulation to increase the ease and convenience of therapy and ultimately enhance patient compliance.  Unlike all other antidepressants, which must be swallowed whole, Remeron SolTab dissolves on the tongue in just a few seconds, has a *pleasant (orange) taste* and can be taken without water. (emphasis added).

Fast-dissolving tablet technology, as applied for Remeron SolTab, will make the patient feel less medicated due to its ease of use.  It can be taken easily without water and has a *pleasant taste*.  All these factors are particularly important in the context of depression and may therefore improve compliance.  (emphasis added)

The record also includes numerous excerpts from the websites of other parties showing that orange flavorings are used in connection with a variety of pharmaceutical products, including cough drops, vitamins, and herbal medications.  The following are just three examples of such use:  "Multi-vitamin syrup with orange flavor has good taste, and easily taken."  (www.merck.com); "[t]hese refreshing flavored Herb Throat Drops...offer you the distinctive taste of Orange-Spice...It's just another tasty, refreshing and soothing way to help you relieve your sore throat naturally."  (www.mothernature.com); and

11

"Diabesity Management Glucose Tablets.  Natural Orange Flavor.  Enjoy D-Care Glucose Tablets when you need a great tasting, fast-acting energy lift."  (www.puretek.com).

The website of Flavors of North America, Inc. indicates that this entity is in the business of manufacturing and selling flavors for use in pharmaceuticals.  The website states that flavors are an important feature of pharmaceuticals, and that "[w]e have personnel specifically trained in the flavoring problems that arise from the difficult taste profiles of the medicaments and expedients used."  It advertises that flavors are available for cold and cough preparations, analgesic products, antacids, ethical liquids and tablets, and vitamin and mineral preparations.  The flavors act, according to the website, as bitterness modifiers, masking agents and sweetness enhancers.  The website indicates that "[b]itter principles in healthcare products are a real challenge since most therapeutic agents are alkaloids that are inherently bitter" and that "[t]here are two ways at this time we can lessen its effects in a product--mask it or modify it long enough to ingest the product."  The flavorings "are meant to be used to cover over inherent undesirable aspects of a product's taste profile," hiding bitterness, chalkiness, sourness and harsh metallic notes.

12

The website lists orange as one of the flavors consistently used for various types of pharmaceuticals.

## Flavor as a Trademark

This appeal presents a case of first impression. In the past, the Board has considered the registrability of "nontraditional" trademarks such as sound[3] and scent.[4] And the Board, the Federal Circuit and the Supreme Court have had occasion to consider the registrability of color.[5] This is, however, the Board's first opportunity to consider the registrability of flavor or taste as a trademark.

At the outset, we acknowledge that the Trademark Act sets forth a broad definition of "trademark," essentially encompassing nontraditional trademarks by not excluding them. Section 45 of the Trademark Act, 15 U.S.C. §1127,

---

[3] In re General Electric Broadcasting Co., Inc., 199 USPQ 560 (TTAB 1978) [sound of a "Ship's Bell Clock" found not inherently distinctive, but would be registrable upon a showing of acquired distinctiveness as a service mark for radio broadcasting services].

[4] In re Clarke, 17 USPQ2d 1238 (TTAB 1990) ["a high impact, fresh, floral fragrance reminiscent of Plumeria blossoms" found registrable for "sewing thread and embroidery yarn"].

[5] See, e.g., Qualitex Co. v. Jacobson Products Co., 514 U.S. 159, 34 USPQ2d 1161 (1995) [green-gold color used on dry cleaning press pads found protectible as a trademark where the color had acquired distinctiveness]; In re Owens Corning Fiberglas Corp., 774 F.2d 1116, 227 USPQ 417 (Fed. Cir. 1985) [the color pink as applied to fibrous glass residential insulation registrable where the evidence showed the color had acquired distinctiveness]; and In re Deere & Co., 7 USPQ2d 1401 (TTAB 1988) [the colors green and yellow, as applied to the body and wheels of machines, respectively, not barred from registration on the basis of functionality; evidence held to establish that the colors had become distinctive of the goods].

defines a trademark as "any word, name, symbol, or device, or any combination thereof" that identifies and distinguishes the goods of a person from those of another and indicates their source.[6]  The United States Supreme Court, in deciding the registrability of color as a trademark, noted that the statutory language describes the universe of things that can qualify as a trademark "in the broadest of terms."  Qualitex Co. v. Jacobson Products Co., 34 USPQ2d at 1162.  The Court went on to state that "[s]ince human beings might use as a 'symbol' or 'device' almost anything at all that is capable of carrying meaning, this language, read literally, is not restrictive."  Id. at 1162.  The Court's view is that "[i]t is the source-distinguishing ability of a mark – not its ontological status as color, shape, fragrance, word, or sign – that permits it to serve" the basic purposes of a trademark.

---

[6] The Senate Report on the Trademark Law Revision Act of 1988 indicates that the amendments to this section kept the words "symbol, or device" with the intention "so as not to preclude the registration of colors, shapes, smells, sounds or configurations where they function as trademarks."  S.Rep.No. 100-515, at 44, 100th Cong., 2d Sess. (1988).  See also The United States Trademark Association Trademark Review Commission Report and Recommendations to USTA President and Board of Directors, 77 TMR 375, 421 (1987)[recommending that "the terms 'symbol, or device'...not be deleted or narrowed to preclude registration of such things as a color, shape, smell, sound, or configuration which functions as a mark."].  We note in passing, however, that any reference to "taste" or "flavor" functioning as a trademark is absent from these reports.

Id. at 1163.

It is against this backdrop that we consider the registrability of applicant's "orange flavor" as a trademark for pharmaceuticals.

### Functionality

We begin by addressing the question of functionality. The Trademark Act was amended expressly to provide that an application may be refused registration if the proposed mark "comprises any matter that, as a whole, is functional." Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5).

The Supreme Court has addressed the issue of functionality in cases both before and after the statutory change. The Court has stated "[i]n general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." Qualitex Co. v. Jacobson Products Co., 34 USPQ2d at 1163-64, quoting Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 214 USPQ 1, 4 n. 10 (1982). A functional feature is one the "exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." Qualitex Co. v. Jacobson Products Co., 34 USPQ2d at 1164. See TrafFix Devices Inc.

v. Marketing Displays Inc., 523 U.S. 23, 58 USPQ2d 1001, 1006 (2001).

The functionality doctrine is intended to encourage legitimate competition by maintaining the proper balance between trademark law and patent law.  As the Supreme Court observed in Qualitex Co. v. Jacobson Products Co., Inc., 34 USPQ2d at 1163-64:

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature.  It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation.  If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).  That is to say, the Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity.  The Lanham Act, furthermore, does not protect trade dress in a functional design simply because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller.

The Federal Circuit, our primary reviewing court, looks at four factors when it considers the issue of functionality: (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product. In re Morton-Norwich Products, Inc., 671 F.2d 1332, 213 USPQ 9, 15-16 (CCPA 1982). See also Valu Engineering Inc. v. Rexnord Corp., 278 F.3d 1268, 61 USPQ2d 1422, 1426 (Fed. Cir. 2002).

The Morton-Norwich factors provide a framework with which to evaluate the evidence relating to functionality. Accordingly, we now turn to consider the facts in evidence that are relevant to the Morton-Norwich factors.

The second Morton-Norwich factor, namely applicant's promotional materials touting the utilitarian advantages of the orange flavor, is particularly significant in assessing functionality in this case. See In re Bose Corp., 772 F.2d 866, 227 USPQ 1 (Fed. Cir. 1985); and In re Gibson Guitar Corp., 61 USPQ2d 1948 (TTAB 2001). See also 1 J.T. McCarthy, McCarthy on Trademarks and Unfair Competition, §

17

7:74 (4th ed. 2006) ["If a seller advertises the utilitarian advantages of a particular feature, this constitutes strong evidence of functionality."]. Although the application is based on an intention to use the mark in commerce, the evidentiary record includes excerpts from applicant's website that illustrate the utilitarian functionality of the orange flavor of applicant's medicine. See In re Promo Ink, 78 USPQ2d 1301 (TTAB 2006) [examining attorney's introduction of portions of applicant's website is permissible in connection with examination of applicant's intent-to-use application]. As applicant's website indicates, poor patient compliance in taking prescribed medicine is a major obstacle to the successful treatment of depression; relative to applicant's product, "more than half [of the medical professionals surveyed] said that greater discretion of administration and pleasant taste were important advantages over conventional antidepressant tablets." Applicant touts, no fewer than four times on its website, that its antidepressant tablet has "a pleasant (orange) taste" and that "the pleasant orange taste" is an "important advantage over conventional antidepressant tablets." Applicant's tablets and pills are designed to dissolve on a patient's tongue; consequently, there is a practical need for the medicine to have an appealing taste.

18

The impression conveyed by applicant's website is that applicant's orange flavor renders its pharmaceutical superior, not in effectiveness, but in getting patients to take the pill so that the pharmaceutical can be effective. It is obvious that a medication, no matter how potentially effective, is useless unless the patient takes it.  Indeed, greater patient compliance may lead to quicker recovery. Thus, because the orange flavor of applicant's medication leads to patient compliance, the orange flavor indirectly increases the efficacy of the medication.

As to the third Morton-Norwich factor, that is, the existence of alternative designs (or, in this case, flavors), the Federal Circuit has noted that the mere fact that other designs are available does not necessarily mean that applicant's design is not functional.  In re Bose, 227 USPQ at 5-6 ["That another type of [design] would work equally as well does not negate that this [design] was designed *functionally* to enhance or at least not detract from the rest of the system...If the feature asserted to give a product distinctiveness is the best, or at least one, of a few superior designs for its *de facto* purpose, it follows that competition is hindered.  Morton-Norwich does not rest on total elimination of competition in the goods." (emphasis in original)].

The fact that there are alternative flavors is hardly surprising, or in and of itself, legally sufficient to establish that applicant's orange flavor is not functional. The question is not whether there are alternative flavors that would perform the same basic function, but whether these flavors work "equally well." Id. at 1427, quoting 1 J.T. McCarthy, McCarthy on Trademarks and Unfair Competition, supra at §7:75.

The record does not indicate with any specificity the number of flavors that might work effectively with applicant's antidepressants. Applicant mentions just two alternatives in its arguments, namely cherry and grape. (Appeal Brief, p. 4). Indeed, it would appear from the record that certain flavors are more effective than others in masking the particular tastes of certain medicinal agents. Although the evidence shows a variety of flavors may be used for different medications, it is possible that not all of these flavors would complement an antidepressant tablet or pill, either because no patient (particularly adults) would swallow such a flavor, or more importantly, because the flavor might not effectively work with the other ingredients.

Applicant itself touts its "pleasant orange taste" as "an important advantage over conventional antidepressant

tablets." While there may be other flavors that can be used for antidepressants, applicant essentially promotes its orange flavor as being better than others. In re Bose Corp., 227 USPQ at 6 ["In concluding that the Bose enclosure design is one of the best from the standpoint of performance of the speaker system, we need only believe Bose's own statements."]. Further, the record shows that orange is consistently used as a flavor in the pharmaceutical trade. Although we cannot definitively say that orange is the most popular flavor, it certainly would appear on the short list of most popular flavors. Thus, on this record, we cannot say that there are true alternatives, or at least a significant number of acceptable alternatives, to an orange flavor for antidepressants.

As to the first Morton-Norwich factor, applicant indicated, in response to the examining attorney's inquiry, that "[a]pplicant's mark is not the subject of an issued or pending or abandoned patent application." (Response, Oct. 14, 2003, p. 3). The fact that the proposed mark is not the subject of a utility patent does not establish that applicant's orange flavor is nonfunctional. TrafFix Devices, Inc. v. Marketing Displays, Inc., 58 USPQ2d at 1006. This factor may only be considered as neutral.

Regarding the fourth <u>Morton-Norwich</u> factor, there is nothing in the record to indicate that the addition of applicant's orange flavor to its pharmaceuticals results in a comparatively simple or cheap method of manufacturing the antidepressant tablet or pill. Applicant has stated that its orange flavor "does not make the pharmaceutical work better or affect its cost or quality. Rather the orange flavor is fanciful in that with or without the orange flavor, the pharmaceutical would be prescribed the same, work the same, and cost the same." (Appeal Brief, p. 4).

While evidence that a product feature makes the product cheaper to manufacture may be probative in showing functionality, evidence that it does not affect its cost is not necessarily proof of non-functionality. As clearly shown by applicant's website and the standard use of flavor in the trade, any money that a pharmaceutical company saves by not flavoring bitter or otherwise unpalatable medicine may not be a wise decision in a competitive environment. Thus, even assuming that the addition of orange flavor to applicant's pharmaceuticals does not render the manufacture thereof cheaper or simpler, this does not mean that

applicant's orange flavor is not functional. We therefore treat this factor as neutral.[7]

Analysis of the Morton-Norwich factors, and in particular, applicant's touting of the functional nature of its orange flavor, and the lack of evidence of acceptable alternatives, supports a finding of utilitarian functionality in this case. The fact that two of the factors are neutral does not affect this conclusion. There is no requirement that all four factors must be found to favor functionality before such a finding can be reached. See TrafFix Devices Inc. v. Marketing Displays Inc., 58 USPQ2d at 1006 [functionality of design means that competitors need not explore whether other designs might be used].

In connection with the functionality issue in this case, it is also helpful to consider competitive need. Analysis of both competitive need and the Morton-Norwich factors is relevant and useful in determining the issue of functionality presented herein. See 1 J.T. McCarthy,

---

[7] Even if the addition of an orange flavor to applicant's pharmaceuticals adds to the cost of manufacture, such additional cost does not prove that orange flavoring is a non-functional feature of the goods. Indeed, improving the utilitarian features of a product may dictate that the manufacturing process be more expensive or complicated. See In re Pingel Enterprise Inc., 46 USPQ2d 1811, 1821 (TTAB 1998) [applicant's choice of a more complex and expensive manufacturing process does not mean that the configuration of the product is not functional].

_McCarthy on Trademarks and Unfair Competition_, _supra_ at §
7:68.

In the past, competitive need has been a foundation of
the analysis of the functionality of certain marks.  The
Federal Circuit has stated the following:

> An important policy underlying the
> functionality doctrine is the
> preservation of competition.  As this
> court's predecessor noted in _Morton-_
> _Norwich_, the "effect upon competition
> 'is really the crux'" of the
> functionality inquiry, and,
> accordingly, the functionality doctrine
> preserves competition by ensuring
> competitors "the right to compete
> effectively."  As we stated in
> _Brunswick Corp. v. British Seagull_
> _Ltd._, "functionality rests on
> 'utility,' which is determined in light
> of 'superiority of design,' and rests
> upon the foundation of 'effective
> competition.'"  The importance of
> competition was reaffirmed in _Qualitex_,
> in which the Supreme Court focused on
> whether a feature "would put
> competitors at a significant non-
> reputation-related disadvantage."  And
> when discussing the policy behind
> limiting trade dress protection, the
> Supreme Court in _TrafFix_ noted that
> "[a]llowing competitors to copy will
> have salutary effects in many
> instances."  (citations omitted).
>
> Thus, in determining "functionality,"
> the Board must assess the effect
> registration of a mark would have on
> competition.

_Valu Engineering Inc. v. Rexnord Corp._, 61 USPQ2d at 1428.

As shown by the evidence, flavors are added to pharmaceutical preparations to function as masks for the unpleasant taste of the medications.  Although one might view this improved palatability as aesthetic appeal, pharmaceutical producers tout, as fact, that flavoring is effective in achieving increased patient compliance, which, in turn, is a utilitarian feature that provides a competitive advantage.  Thus, we view the issue here, as do both applicant and the examining attorney, as utilitarian functionality.  See Brunswick Corp. v. British Seagull Ltd., 35 F.2d 1527, 32 USPQ2d 1120 (Fed. Cir. 1994), *cert. denied*, 514 U.S. 1050 (1995) [color black for outboard motors functional, even though it had no utilitarian effect on the mechanical operation of the engines, because it provided competitive advantages in the ease of coordination with a variety of boat colors and reduction of the apparent size of the engine].  The Supreme Court, in its <u>Qualitex</u> decision, cited, with apparent approval, the Federal Circuit's decision in <u>Brunswick</u> as an example of a situation where color has a utilitarian function.

We view the Federal Circuit's language in <u>Brunswick</u> regarding competitive need to be applicable to applicant's attempt to register its orange flavor:

The Board considered the proposed mark's functionality: "Although the color black is not functional in the sense that it makes these engines work better, or that it makes them easier or less expensive to manufacture, black is more desirable from the perspective of prospective purchasers because it is color compatible with a wider variety of boat colors and because objects colored black appear smaller than they do when they are painted other lighter or brighter colors. The evidence shows that people who buy outboard motors for boats like the colors of the motors to be harmonious with the colors of their vessels, and that they also find it desirable under some circumstances to reduce the perception of the size of the motors in proportion to the boats." (citation omitted) The Board concluded that the color black, applied to the engines, is de jure functional because of competitive need.

*****

The color black, as the Board noted, does not make the engines function better as engines. The paint on the external surface of an engine does not affect its mechanical purpose. Rather, the color black exhibits both color compatibility with a wide variety of boat colors and ability to make objects appear smaller. With these advantages for potential customers, the Board found a competitive need for engine manufacturers to use black on outboard engines. Based on this competitive need, the Board determined that the color was de jure functional. This court discerns no error in the Board's legal reasoning and no clear error in its factual findings...All outboard engine manufacturers color their products. These manufacturers seek

26

> colors that easily coordinate with the wide variety of boat colors. The Board found that the color black served this non-trademark purpose. In addition, the Board found that the color black serves the non-trademark purpose of decreasing apparent object size. The record showed that these features were important to consumers. Unlike the color pink in Owens-Corning, the Board found a competitive need for the color black. Thus, the Board concluded that registration of Mercury's proposed mark would hinder competition. The court discerns no clear error in the Board's findings.

Brunswick Corp. v. British Seagull Ltd., 32 USPQ2d at 1121; 1122-23.

As stated by the Federal Circuit in Brunswick, "[a]s with any mark, the test for de jure functionality hinges on whether registration of a feature hinders competition, and not whether the feature contributes to the product's commercial success." 32 USPQ2d at 1124. In the Brunswick case, color compatibility and the ability to decrease apparent engine size supplied a competitive advantage. See also In re Ferris Corp., 59 USPQ2d 1587 (TTAB 2000) [pink skin color held functional for wound dressings].

In the same way, applicant's applied-for orange flavor is functional. Just as in the case of Brunswick wherein the color black did not make the outboard engines work better, applicant's orange flavor does not make the

27

medicine intrinsically any more effective in treating depression. Rather, like the advantages of color compatibility and reduction in apparent engine size afforded by the color black, applicant's orange flavor makes its antidepressant tablets and pills more palatable for patients, resulting in increased patient compliance, and thereby supplying applicant with a competitive advantage. Registration by applicant would hinder competition by placing competitors at a substantial competitive disadvantage.

As indicated above, the Board has not had an opportunity to rule on the registrability of flavor as a trademark until this case. Moreover, there is a dearth of case law from other tribunals squarely addressing this issue. One case that dealt with the functionality of flavor, and that has applicability to our decision herein, is William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526 (1924).[8] This litigation involved two competing pharmaceutical manufacturers that were using chocolate to give their liquid quinine preparations color and flavor, and to aid in suspending the other ingredients. Lilly sued Warner and sought, in pertinent part, to enjoin Warner's

---

[8] Neither applicant nor the examining attorney cited this case.

continued manufacture and sale of the preparation if

flavored with chocolate.  The Supreme Court refused to find

that Lilly had exclusive rights in the brown color of the

quinine preparation, which was due to the presence of

chocolate as a masking agent and suspension medium.  The

Court stated:

> Chocolate is used as an ingredient, not
> alone for the purpose of imparting a
> distinctive color, but for the purpose
> of also making the preparation
> peculiarly agreeable to the palate, to
> say nothing of its effect as a
> suspending medium.  *While it is not a*
> *medicinal element in the preparation,*
> *it serves a substantial and desirable*
> *use, which prevents it from being a*
> *mere matter of dress.*  It does not
> merely serve the incidental use of
> identifying the respondent's
> preparation and it is doubtful whether
> it should be called a nonessential.
> (emphasis added)(citation omitted).

Although the Court did not use the term "functional," the

Court, in suggesting that the chocolate was not

"nonessential," essentially concluded that chocolate was

functional.  In so holding, the Court observed the

following:

> The use of chocolate as an ingredient
> has a three-fold effect:  It imparts to
> the preparation a distinctive color and
> a distinctive flavor, and to some
> extent, operates as a medium to suspend
> the quinine and prevent its
> precipitation.  *It has no therapeutic*
> *value; but it supplies the mixture with*

29

> *a quality of palatability for which*
> *there is no equally satisfactory*
> *substitute.* (emphasis added)

Thus, the Court appears to be stating that the chocolate was functional because, among other things, its flavor made the medicine palatable; the flavor "serves a substantial and desirable use, which prevents it from being a mere matter of dress." As the Court later articulated the legal standard in subsequent cases, the chocolate, including the chocolate flavor, was "essential to the use or purpose of the product." Qualitex Co. v. Jacobson Products Co., 34 USPQ2d at 1163-64. The same can be said concerning applicant's orange flavor.

In sum, the evidence clearly shows that the medicinal ingredients in pharmaceuticals generally have a disagreeable taste that may be masked so that patients will be more likely to take the medicine. Therefore, flavor performs a utilitarian function that cannot be monopolized without hindering competition in the pharmaceutical trade. To allow registration of "an orange flavor" as a trademark would give applicant potentially perpetual protection for this flavor, resulting in hindrance of competition. See Jerome Gilson and Anne Gilson LaLonde, *Cinnamon Buns, Marching Ducks and Cherry-Scented Racecar Exhaust: Protecting Nontraditional Trademarks*, 95 Trademark Rep.

773, 800-01 (July-August, 2005) ["One substantial impediment to enforcement of flavor marks is functionality. Certain flavors may be found to be functional because they need to be available to the competition."]; and Nancy L. Clarke, *Issues in the Federal Registration of Flavors as Trademarks for Pharmaceutical Products*, 1993 U. Ill. L. Rev. 105, 132 ["[I]f the Patent and Trademark Office or the courts are asked to grant trademark status to the flavor of a prescription pharmaceutical product, they should refuse to do so.  The Patent and Trademark Office and the courts may rely on the utilitarian functionality doctrine and on practical considerations to deny legal protection to flavors on this type of product."].

### Failure to Function as a Mark

We now address the question of whether applicant's proposed mark functions as a trademark.  Implicit in the statutory definition of a "trademark" set forth above is a requirement that there be a direct association between the matter sought to be registered and the goods identified in the application, that is, that the matter is used in such a manner that it would be readily perceived as identifying such goods.  The present case is based on an intention to use the mark in commerce; applicant has not filed an amendment to allege use and, thus, there is no specimen of

record.  Accordingly, we must make our determination based on the description provided in the application, namely, "an orange flavor," rather than on any evidence of how the proposed mark would be or is actually used.

As is the case with any trademark, mere intent that a word, name, symbol or device function as a trademark or service mark is not enough in and of itself.  In re Morganroth, 208 USPQ 284 (TTAB 1980).  In the present case, the critical inquiry becomes:  Would the "orange flavor" sought to be registered be perceived as a source indicator or merely as a flavor of the pharmaceutical?

To state the obvious, virtually everything that humans put in their mouths has some sort of flavor:  from food to wine to toothpaste to pharmaceuticals.[9]  As shown by the evidence of record, it is standard practice within the pharmaceutical industry to flavor medicines to make them more palatable.  This was true long before the application in this case was filed.  Indeed, the evidence shows that there are at least two entities whose businesses are devoted solely to manufacturing flavorings to add to medicines to make them more palatable.  Because of this

---

[9] Indeed, even a tablet or pill designed for medicine that is swallowed quickly with water would normally have some taste or flavor.

common practice, consumers would not view the flavor of a pharmaceutical as a trademark; rather, they would consider it to be an inherent feature of the product that renders it more appealing. In this respect, flavor is analogous to product design and color. As stated by the Supreme Court:

> In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs--such as a cocktail shaker shaped like a penguin-- is intended not to identify source, but to render the product itself more useful or more appealing.

Wal-Mart Stores, Inc. v. Samara Brothers, 529 U.S. 205, 54 USPQ2d 1065, 1069 (2000).

There is nothing in the record to indicate that "an orange flavor" for applicant's antidepressants would be perceived as a trademark for them. On the contrary, the record shows that an orange flavor is used in numerous medicines. As a result, consumers would not view the orange flavor of an antidepressant tablet or pill as a trademark; rather, they would consider it only as just another feature of the medication, making it palatable. To be sure, the record is completely devoid of any evidence of consumer recognition of applicant's "orange flavor" as a trademark.

Inasmuch as flavors, including orange, are a common feature of pharmaceuticals, we find that consumers would not view applicant's orange flavor as a trademark. See Jerome Gilson and Anne Gilson LaLonde, *Cinnamon Buns, Marching Ducks and Cherry-Scented Racecar Exhaust: Protecting Nontraditional Trademarks*, supra at 801 ["Consumers may not see flavor in a product as a trademark. To them, it may be just another feature of the goods."].

Applicant's contention that its orange flavor is so unique and distinctive that it deserves trademark protection is not persuasive. In this connection, we note that applicant has applied to register merely "an orange flavor," without limiting its application to a particular type of orange flavor. Although the examining attorney accepted the description "an orange flavor" as adequate, this description hardly describes any particular orange flavor, let alone applicant's purportedly distinctive orange flavor. If a registration were to issue for the mark with this description, applicant would gain exclusive rights to all flavors of orange, not just the "unique" orange flavor that applicant claims it has.

Even if we were to treat applicant's application as being for its "unique" orange flavor, we would find that applicant's flavor fails to function as a mark. Because

34

flavor is generally seen as a characteristic of the goods, rather than as a trademark, a flavor, just as in the cases of color and scent, can never be inherently distinctive. As previously discussed, flavor, including an orange flavor, is so intrinsic a feature of pharmaceuticals, that consumers will not perceive a flavor, even a "unique" orange flavor, as a trademark unless they have been educated to perceive it as such. Thus, any registration of a flavor requires a substantial showing of acquired distinctiveness. Evidence of acquired distinctiveness was not introduced in this application. See, e.g., Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 54 USPQ2d at 1068, citing Qualitex Co. v. Jacobson Products Co., Inc., 34 USPQ2d 1162-1163. See also TMEP §1202.05(a) (4th ed. 2005) ["The burden of proving that a color mark has acquired distinctiveness is substantial."]; and TMEP §1202.13 (4th ed. 2005) ["The amount of evidence required to establish that a scent or fragrance functions as a mark is substantial."].

Although our decision is based on the analysis set forth above, we are not blind to the practical considerations involved in the registration of flavor marks. Flavor perception is very subjective; what applicant considers to be a unique and distinctive orange

flavor may be considered by patients as simply an orange flavor.  Moreover, the Office's examination of flavor marks, not to mention litigation at the Board, would be very problematic.[10]

Further, it is not clear how taste would as a practical matter function as a trademark.  A consumer generally has no access to the product's flavor prior to purchase.  A trademark is defined as a word, name, symbol, or device that is used by a person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods."  Section 45 of the Trademark Act, 15 U.S.C. §1127.  Unlike color, sound and smell, there

---

[10] In the abstract, we see some difficulty in how a taste could function as a trademark.  As stated by Ms. Clarke in her law review article:

> A flavor's subjectivity derives principally from its complexity.  Flavors consist of three elements:  aroma, taste (sweet, acid, bitter, or saline), and feeling.  Numerous factors influence taste acuity, among them age, disease, and, for certain tastes, temperature.  In addition, one's taste perception varies with practice, increasing the subjectivity of this sense.  Thus, because of the subjectivity of flavor perception, the risk of inconsistent results would be substantial if the PTO examined flavors for trademark protection, or if a flavor trademark owner sought to enforce his rights in court.  (footnotes omitted).

Nancy L. Clarke, Issues in the Federal Registration of Flavors as Trademarks for Pharmaceutical Products, supra at 131.

generally is no way for consumers routinely to distinguish products by sampling them before they decide which one to purchase.[11] Generally, it would not be expected that prescribed antidepressants would be tasted prior to purchase so that a consumer, in conjunction with a physician, could distinguish one antidepressant from another on the basis of taste. Thus, the consumer, in making a purchasing decision involving either a prescribed medication or an over-the-counter medication, is unable to distinguish one pharmaceutical from another based on flavor. Consequently, it is difficult to fathom exactly how a flavor could function as a source indicator in the classic sense, unlike the situation with other nontraditional trademarks such as color, sound and smell, to which consumers may be exposed prior to purchase.

**Decision:** The refusals to register are affirmed.

---

[11] Further, what would be an acceptable specimen of use in this case? Without ingesting applicant's antidepressant tablet or pill, there is no way to taste the purportedly "distinctive" orange flavor that applicant claims as its trademark. Would the orange flavor used in a placebo tablet or pill (submitted as a specimen) taste the same as the "distinctive" orange flavor masking the bitterness of applicant's antidepressant? And, the same flavor may taste different to different consumers. See n. 10, supra. Given that the same flavor may be described in a variety of different ways, a detailed description of the flavor on labels, packaging, etc. would not be sufficient.