Mailed:
February 13, 2009

This Opinion is a
Precedent of the TTAB

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————

**Trademark Trial and Appeal Board**

————

In re Vertex Group LLC

————

Serial No. 76601697
Serial No. 78940163

————

K. Danica Ray of DLA Piper US, LLP for Vertex Group LLC.

Jason Paul Blair, Trademark Examining Attorney, Law Office 104 (Chris Doninger, Managing Attorney).[1]

————

Before Quinn, Hairston and Rogers, Administrative Trademark Judges.

Opinion by Rogers, Administrative Trademark Judge:

Applicant Vertex Group LLC seeks to register as a trademark on the Principal Register a sound described as follows:

> … a descending frequency sound pulse (from 2.3kHz to approximately 1.5kHz) that follows an exponential, RC charging curve, wherein said descending frequency sound pulse occurs four to five times per second, and that over a one second period of time, there is alternating sound pulses

---

[1] Tricia Sonneborn of Law Office 110 examined application serial no. 76601697 until reassignment of the case during the appeal.

and silence with each occurring approximately 50% of the time during a one second period of time.[2]

Registration of the sound is sought for goods identified as a "Personal security alarm in the nature of a child's bracelet to deter and prevent child abductions," in Class 9 (application Serial No. 76601697; the "child's bracelet application") and as "Personal security alarms," in Class 9 (application Serial No. 78940163; the "personal alarms application"). Both applications were filed based on applicant's stated intention to use the mark in commerce for the identified goods. Though the applications were examined separately, the same examining attorney briefed the appeals. In view of the virtually identical issues presented, the Board has chosen to issue this single decision.

Notwithstanding the differing courses of examination, both applications have been finally refused on the ground that the proposed mark is functional, see Trademark Act §2(e)(5), 15 U.S.C. §1052(e)(5), in that the sound is a feature of the goods that serves a utilitarian purpose. In addition, both applications have been refused under Sections 1, 2 and 45 of the Act, 15 U.S.C. §§1051, 1052 and

---

[2] A recording of the sound can be heard by accessing an audio file accessible through the USPTO website, at the following address: **http://www.uspto.gov/go/kids/soundex/78940163_0001.mp3**.

1127, on the ground that the proposed mark does not function as a mark to identify and distinguish the source of applicant's goods from similar goods of others.

*Evidence in the Applications*

As noted, both of the involved applications were filed based on applicant's stated intention to use the sound as a mark in commerce.  The child's bracelet application, not having been refused during initial examination, was amended to assert use of the proposed mark in commerce after applicant received a notice of allowance from the Office.  Thus, there is a specimen of use present in that application file.  The personal alarms application remains based on intent-to-use and has no specimen.  Nonetheless, because the same refusals were made final in each application, applicant has submitted considerable evidence in each to support its claim that the sound is not functional, is inherently distinctive and is registrable.  This evidence in the respective applications overlaps a good deal, though there is more in the child's bracelet application.  It appears from the totality of the evidence that applicant has, to date, only produced and marketed a personal alarm for use by children, specifically, a combination watch and personal alarm for children, which

applicant refers to as the "AmberWatch."  Evidence offered

in one or both applications includes the following:

▶Reprints from the website **www.amberwatch.com**,[3] one

page of which has a "click to hear" feature that allows

website visitors to listen to "the Unique Sound of

AmberWatch™."  Other pages from the site include the

following statements:

> "When the AmberWatch® is activated, it emits a
> 115-decible, [sic] trademarked alert signal that
> can be heard from over a football field away."

> "The trademarked sound of the AmberWatch® Alert
> Signal is so unique and draws so much attention
> that everyone around can be made aware that it
> means there is something amiss."

> "The creators of the AmberWatch® knew that they
> wanted a volume that reached over 100 decibels;
> they had to reject several versions before they
> were happy with how loud the Alert Signal [watch]
> was[,] while remaining compact enough to fit on a
> child's wrist.  The result was all original
> engineering and a patented technology!  The
> AmberWatch is truly an engineering marvel."

> "**Trademarked alert signal.**  The unique sound and
> rhythm of the AmberWatch® Alert Signal has been
> trademarked, which means that it won't be
> mistaken for any other sound.  The trademarked
> AmberWatch® Alert Signal means a child is in need
> of immediate help."

> "The AmberWatch is more than 4x louder than a
> screaming child!"[4]

---

[3] More pages from this website were made of record in the child's
bracelet application than in the personal alarms application.

[4] On the amberwatch.com "how it works" web page, there is a chart
that lists the decibel levels of various sounds, including that
of a screaming child and of the AmberWatch.  Though these sound

▶A reproduction of what appears to be a multi-panel package insert or product instruction booklet for the child's bracelet.[5]

▶A 13-slide "Retail Presentation" dated September 2005 that is geared toward prospective retailers of the AmberWatch.[6]  A "Background" slide says AmberWatch$^{TM}$ was founded in 2002, and brought its "AmberWatch$^{TM}$ product to market in Q4 2004 and to date has sold close to 10,000 units (without retail presence)."[7]  A "Competition" slide reads "There are currently no products that compete in the retail channel with AmberWatch$^{TM}$."  A "Public Relations" slide notes August 2005 media coverage and scheduled coverage in magazines for September and November 2005.

▶The specimen accompanying the statement of use filed in the child's bracelet application, specifically, a color reprint from the AmberWatch website, referring to the

---

levels are listed as only 20 decibels different, the page states, "Remember, the decibel system is logarithmic, not linear, and every increase of 6dB is actually a doubling of the loudness."

[5] Submitted only in the child's bracelet application.

[6] Submitted only in the child's bracelet application.

[7] This particular slide uses AmberWatch both as a reference to a company and to a product.  Other slides in the presentation also use AmberWatch as the name of a company.  Nowhere in the presentation is there a reference to Vertex Group LLC.  We construe this as an indication that applicant has chosen to use the word AmberWatch both as a business name and a product name.

product as a "Super-Loud Child Safety Alarm" and displaying a link to an audio file of the sound ("Experience the AmberWatch Click to Hear Safety Alarm").

▶The published patent application covering the "AmberWatch," described therein as a "personal safety device" or "personal security device," which specifically discusses various embodiments for children, adults and the elderly. The application abstract explains "The alarm circuit may be an audible alarm (80-125 decibels) circuit, a visual alarm circuit, an odor alarm, an electronic signal generation circuit or may generate a tracking signal." The description of an exemplary embodiment focuses on that of a digital wristwatch with a "loud alarm," but notes that the device "may include a volume control for the audible signal so that, for example, the volume may be adjusted (to be louder or quieter)." The description also notes the presence of a chamber for a sound generation element and the preference for "a plurality of holes located on the sidewall." The size of the holes "may be adjusted according to the pitch of the sound that is generated, the desired volume, etc." The application does not otherwise discuss any particular features for the audible alarm that can be generated by the device.

►Reprints from the "Harmony Central" website (**www.harmony-central.com**) with information defining pitch and frequency, and which includes a list of "useful pitches and frequencies."  This refers to both the "nominal lower limit of hearing (20 Hz)" and the "nominal upper limit of hearing (20 kHz)."

►Reprints from numerous websites exhibiting competitive products (personal security devices).  These devices are all promoted as utilizing loud alarms ranging from 100 to 140 decibels, and the sites include the following statements about the alarms:[8]  "One of the loudest and most earpiercing sirens available today. Be warned!"; "foul odour, UV tracer and earpiercing Alarm function"; "ultra-loud alarm"; "high output alarm"; "an extremely loud siren-like sound"; "'ear-piercing' blast readily recognized"; "ear-piercing, blood-curdling 118 DB blast of sound"; "high pitch tone alarm"; and "high pitched shriek … is readily recognized as an emergency call for help".  Most of the products featured on the websites are key chains or

---

[8] The websites include **www.streetdefender.com**, **www.c-p-p.co.uk**, **www.globalsources.com**, **www.tbotech.com/personal-alarms**, **www.mypreciouskid.com/alarm**, **www.tradekey.com**, **www.alibaba.com**, and **www.guarddog.net**.

other devices, and appear to be only alarms or security devices, and do not include combination watches/alarms.[9]

▶An article from the Wall Street Journal's web-based publication (**http://online.wsj.com**) about "the pending launch of a Global Positioning System [GPS] software application called AmberWatch Mobile."

▶Reports of media coverage of, or press releases about, applicant's product, about the AmberWatch Foundation, and about events or stores featuring distribution or sale of the AmberWatch. Some of this evidence discusses corporate and other sponsors underwriting distributions of children's bracelet alarms to at-risk youth. For example, one press release reports on the "first major giveaway of Project AmberWatch, a fundraising initiative for the AmberWatch Foundation," and the distribution of 400 "AmberWatches®" to at-risk youth in Montebello, CA. This press release mentions the "trademarked alert signal and super bright flashing LED

---

[9] The record may appear to include contradictory submissions, in that applicant's slide presentation for prospective retailers of the AmberWatch says there are "no products that compete in the retail channel with AmberWatch™," but applicant has submitted the websites showing what applicant refers to as "competitors in the personal security devices market" (p. 4, Request for Reconsideration in child's bracelet application). As the competitors do not appear to produce a combination watch and personal alarm, we construe the statement in applicant's slide presentation as a reference to this fact.

lights" of the watch.  A media release for a campaign in San Diego refers to the "AmberWatch's trademarked sound" and distribution of 75 of 800 watches allocated for at-risk youth, and reports that the event garnered a lot of TV coverage, print media coverage, and website coverage on media outlets' websites; a press release after the event also refers to the trademarked signal.  Other materials discuss the availability of applicant's watch in Yoke's Fresh Markets in the Pacific Northwest, and refer to the alert signal as a 115-decibel signal, but do not refer to the signal being trademarked.  Except for reported media coverage of the San Diego event, all the rest of this material consists of press releases about events or initiatives, not about press coverage received.  Applicant also submitted an excerpt from media coverage received on CNN's Prime Time.

▶Material demonstrating distribution to and airing of radio public service announcements (PSAs) via 100 radio stations in 16 states.  It is stated that the PSAs will be rotated with others and broadcasting of them is voluntary, so some stations may not air them unless they have unsold ("remnant") air time.[10]  This material includes a list of

---

[10] The only specific records show PSA airings on radio stations in Lima (OH), Gallup (NM), Tucson (AZ), and Tuscaloosa (AL).

entertainment celebrities and athletes who are

"contributors" to Radio and Television PSAs, which appears

to be a reference to their contribution of time to record

the PSAs.  Recordings of the nearly two dozen radio PSAs

were made of record on CDs.  A representative transcript is

below:

> "Hi.  I'm Al Roker.  The sound you're about to
> hear means a child may need your help.  [alarm
> sound played]  If you hear this sound, a child
> may be in danger. Be aware. Be alert.  And
> let's all work together to stop child abduction.
> [Announcer:] Brought to you by the AmberWatch
> Foundation."

►Ads showing the AmberWatch product available online

at Target.com, Amazon.com, NexTag.com, ANTOnline,

TheNerds.net and Zappos.com.

►The child's bracelet application itself says the

"bracelets contain the ability to generate a sound in

connection with an alert device wherein the sound is

audible to a range of 400 feet from the source and operates

at a level of 105 decibels."  The personal alarms

application, although it includes the same description of

the sound proposed for registration, does not include a

statement about the volume of the sound produced by the

personal alarms.

►The audio file of the alarm sound, which plays for 8-

9 seconds; but it is clear from the record that the alarm

sound can play continuously for 30 minutes or more when the alarm watch is activated.

The evidence offered in support of the refusals of registration in the two applications is virtually identical, notwithstanding review of the applications by different examining attorneys, and includes:

▶Definitions of the word "alarm," including "a device that signals the occurrence of some undesirable event," "an automatic signal (usually a sound) warning of danger," "any sound, outcry, or information intended to warn of approaching danger," "a warning sound; signal for attention," "*Animal Behavior*. any sound, outcry, chemical discharge, action, or other signal that functions to draw attention to a potential predator," and "An electrical, electronic, or mechanical device that serves to warn of danger by means of a sound or signal" (from various sources collected at **http://dictionary.reference.com**).

▶An article titled "Human Hearing: Amplitude Sensitivity Part 1" (dated April 5, 2005), retrieved January 4, 2007 from **www.audioholics.com**, which reports "20 Hz to 20 kHz" as "the frequency response across the audible spectrum." One point of the article is that the

11

perceptions of sounds are highly dependent on "frequency, age, sex, and background-noise level."[11]

▶Reprints of pages from the amberwatch.com website, already discussed in detail, above, in our review of the evidence submitted by applicant.

▶A paper titled "Detecting Alarm Sounds" by Daniel P.W. Ellis, Department of Electrical Engineering, Columbia University.[12]  The report recounts investigation of "automatic recognition of [alarms such as phone rings, smoke alarms and sirens] both because of the practical applications for the hearing impaired, and also because alarm sounds are deliberately constructed to be easily heard."  The report also states that 3000 Hz or 3kHz "is close to the region of greatest hearing sensitivity."

▶Excerpted pages from a publication (No. CPSC-ES-0502; December 2004) of the U.S. Consumer Product Safety

---

[11] In Office actions, the examining attorneys appear to have relied on the audioholics.com website as support for the contention that "humans can most easily perceive sound frequencies between 2000 and 4000 Hertz," but we do not find support for the contention in the article.  Further, other evidence, discussed infra, shows that human "hearing is typically optimal between 1000 and 4000 Hz."

[12] The paper is undated, but the most recent of its cited references were published in 2001, so we conclude that the paper was prepared in 2001 or later.  There is nothing, however, to indicate whether the paper was ever published and, if so, in what way.  Nor is there an indication of the source of the paper, i.e., from where it was obtained.

Commission, titled "A Review of the Sound Effectiveness of Residential Smoke Alarms," which includes the following information:

> The most common unit used to measure sound intensity is the decibel, or dB.  The decibel scale is a logarithmic scale – that is, an increase of 10dB in sound intensity represents a 10-fold increase in sound power….
>
> Pitch increases as the number of Hz increases.  The human ear can discern sounds ranging from 20 to 20,000 Hz, but … hearing is typically optimal between 1000 and 4000 Hz.  A sound with a frequency spectrum in the 1000 to 4000 Hz range will be perceived as being louder than a sound of equal sound energy that is comprised predominantly of frequencies outside of this range.  As adults age, a significant proportion experience a gradual, subtle hearing impairment, which is typically first manifested as a reduced ability to detect higher frequency sounds (between 3000 and 6000 Hz).

The CPSC paper also explains that "a residential smoke alarm is typically between 3,500 to 4,000 Hz" and a voluntary Underwriters Laboratories standard requires an 85 decibel sound at a distance of 10 feet from the alarm's horn.  Further, the standard requires the signal to have a "'three pulse' temporal pattern," meaning the sound will pulse on and off in a particular pattern.  While smoke alarms at one time "produced a continuous sound when alarming," the three pulse pattern has become accepted and is incorporated into other standards and codes.

Many of the rest of the CPSC article excerpts deal with assessment of the effectiveness of various alarms in awakening individuals of different ages and under different "sleep variables." However, one page discusses the characteristics and features of various audio alarms and includes guidelines for "producing a more audible alarm," including the following two:

> Use frequencies between 500 and 3000 Hz, because the ear is most sensitive to this middle range.

> Use a modulated signal. For example, use a warbling sound varying from 1 to 3 times per second since it is different enough from other daily sounds such as microwave beeping, clothes dryer buzzer, etc.

### Sound as a Trademark

Before reviewing the evidence recounted above, as well as the arguments of applicant and the examining attorney, in the light of applicable law, we consider the treatment of sound as a trademark or service mark. The Trademark Act embodies "a flexible approach toward the concept of what constitutes a service mark or a trademark" and the Board has recognized that "sounds may, under certain conditions … function as source indicators in those situations where they assume a definitive shape or arrangement and are used in such a manner so as to create in the hearer's mind an association of the sound with a [good or] service." *In re*

*General Electric Broadcasting Co., Inc.*, 199 USPQ 560, 563 (TTAB 1978).[13]   See also, *In re N.V. Organon*, 79 USPQ2d 1639, 1644 (TTAB 2006) (the Trademark Act includes a broad definition of "trademark," and it is the source-distinguishing capacity of a proposed mark that is significant, "not its ontological status as color, shape, fragrance, word or sign") *quoting Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 34 USPQ2d 1161, 1163 (1995).

In *General Electric*, the Board noted that "a distinction must be made between unique, different, or distinctive sounds and those that resemble or imitate 'commonplace' sounds or those to which listeners have been exposed under different circumstances."   199 USPQ at 563. Even a sound "so inherently different or distinctive that it attaches to the subliminal mind of the listener to be awakened when heard" must nonetheless "be associated with the source or event with which it is struck."   Id. Moreover, registration of commonplace sounds and those to

---

[13] *General Electric* recognized "the registration of such sound marks as a series of musical chimes (Reg. No. 916,522, issued July 13, 1971), the ringing of the Liberty Bell (Reg. No. 548,458, issued September 18, 1951), the sound of a creaking door (Reg. No. 556,780, issued November 25, 1952), the audio and visual representation of a coin spinning on a hard surface (Reg. No. 641,872 issued February 19, 1957), a sound consisting of three short pulses followed by a longer pulse (Reg. No. 922,585, issued October 19, 1971), and the musical notes, E flat, B flat, G, C, F, electrically reproduced (Reg. No. 928,479, issued February 1, 1972)."   *General Electric*, 199 USPQ at 563.

which listeners have been exposed under different circumstances "must be supported by evidence to show that purchasers, prospective purchasers and listeners do recognize and associate the sound with services offered and/or rendered exclusively with a single, albeit anonymous, source." Id; *compare with In re Upper Deck Co.*, 59 USPQ2d 1688 (TTAB 2001), wherein registration was refused for a mark consisting of use of a hologram on trading cards, in part because of other uses of holograms, even though not as a mark (e.g., for anti-counterfeiting purposes), which made consumers less likely to perceive any hologram as a mark.

*General Electric* contemplates registration on the Principal Register of sounds as marks, when the sounds are arbitrary, unique or distinctive and can be used in a manner so as to attach to the mind of the listener and be awakened on later hearing in a way that would indicate for the listener that a particular product or service was coming from a particular, even if anonymous, source. On the other hand, *General Electric* also contemplates that commonplace sounds, or those which individuals may have been exposed to under other circumstances, must be shown by evidence to be distinctive, in other words, commonplace sounds must be shown to have acquired distinctiveness.

16

Subsequent to the Board's decision in *General Electric*, the Supreme Court has stated that both color and trade dress in the nature of product design can never be inherently distinctive and can only be registered on a showing of secondary meaning. See *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 34 USPQ2d 1161 (1995) (green-gold color used on dry cleaning press pads protectible as a trademark because of acquired distinctiveness) and *Wal-Mart Stores, Inc. v. Samara Brothers*, 529 U.S. 205, 54 USPQ2d 1065, 1068-69 (2000) (design of children's clothing items not protectible except on a showing of secondary meaning). There is no subsequent case law, however, stating such a rule in regard to sound marks. Nonetheless, we find it appropriate to follow the Supreme Court's rule regarding color and product design, for certain types of sound marks. As noted, *General Electric* draws a distinction between inherently distinctive sound marks, and those which must be shown to have acquired distinctiveness. When a sound is proposed for registration as a mark on the Principal Register, for goods that make the sound in their normal course of operation, registration is available only on a showing of acquired distinctiveness under Section 2(f). Examples of such goods would include products such as alarm

17

clocks, appliances that include audible alarms or signals, telephones, and the alarm products of applicant.[14]

In these cases, applicant seeks registration of the alarm sound without resort to Section 2(f) of the Trademark Act, 15 U.S.C. §1052(f).[15] In view of our holding that registration on the Principal Register of the sound emitted by applicant's product in its normal course of operation is only available on a showing of acquired distinctiveness, registration is refused. However, we note that even in the absence of the rule we announce in this decision, registration is refused on the two bases advanced by the examining attorney, as discussed below.

***Failure to Function as a Mark***

We first address the refusal under Sections 1, 2 and 45 and the question of whether applicant's proposed mark

---

[14] Our list is for illustrative purposes only and not intended to foreclose future inquiry into whether sounds made by other products might also be registrable only on a showing of acquired distinctiveness.

[15] There is a distinction, of course, between the two applications. As the child's bracelet application was amended to assert use in commerce, it could have also been amended to claim acquired distinctiveness, but the personal alarms application, which remains based on intent to use, cannot proceed under Section 2(f) (or on the Supplemental Register). In any event, applicant seeks registration of the mark without resort to a claim of acquired distinctiveness in either application. Even if applicant were seeking registration under Section 2(f), no amount of evidence of acquired distinctiveness would overcome a prima facie showing by the examining attorney that the sound is functional under Section 2(e)(5). See 15 U.S.C. §1052(f).

functions as a trademark. "Implicit in the statutory definition of a 'trademark' … is a requirement that there be a direct association between the matter sought to be registered and the goods identified in the application, that is, that the matter is used in such a manner that it would be readily perceived as identifying such goods." See *N.V. Organon*, supra, 79 USPQ2d at 1649. See also, 15 U.S.C. §1127; and *In re Roberts*, 87 USPQ2d 1474, 1478 (TTAB 2008). Of course, because applicant's products actually emit the sound proposed for registration as a mark, there is in a purely technical sense a direct association of the sound and the product. But that is not the type of direct association contemplated by the statute and case law. Rather, the association must be one of origin or source, and one that would be drawn between the sound and the product by prospective purchasers, when they hear the sound. See *General Electric*, supra, 199 USPQ at 563 (the sound must "be associated with the source or event with which it is struck").

As is the case with any trademark, mere intent that a word, name, symbol or device function as a trademark or service mark is not enough in and of itself. See *In re Morganroth*, 208 USPQ 284 (TTAB 1980). Thus, the mere fact that applicant describes the sound of its products as

19

"trademarked" on the AmberWatch.com website and in press
releases regarding the product, does not necessarily mean
that the sound in fact performs as a trademark.[16]  In the
present case, the critical inquiry becomes:  Would the
sound sought to be registered be perceived as a source
indicator or merely as a sound emitted by the personal
alarm to call public attention to the conduct prompting the
alarm?  Applicant argues that the sound would be perceived
as an indication of the source of its product.  However,
much of the evidence on which applicant relies to support
its argument is essentially in the nature of evidence of
acquired distinctiveness.  As noted, because applicant does
not seek registration under Section 2(f), such evidence is
inapposite.  Nonetheless, we now examine such evidence on
the theory that applicant has offered it not to show
acquired distinctiveness but, instead, to show that its use
and promotion of the sound, as well as the use and
promotion of the sound by the AmberWatch Foundation, has

---

[16] There is nothing in the record to indicate what applicant means
when it refers to the sound as "trademarked."  It is not
federally registered and there is no evidence that it is the
subject of any state registration.  Accordingly, we can only take
these references to be the equivalent of a TM designation or the
like, i.e., an assertion or claim that the sound serves the
function of a trademark.  However, the mere use of TM or
"trademarked" does not automatically transform a word, design,
color or sound into a trademark.  See *In re Aerospace Optics
Inc.*, 78 USPQ2d 1861, 1864 (TTAB 2006).

educated the consuming public as to the assertedly distinctive aspects of the sound.

Applicant emphasizes its use of the proposed mark aurally in ads whenever possible and in its characterization of the sound as unique when it cannot be played. The record, however, contains no information on radio or television advertising by applicant of the product, whether or not involving aural use of the sound. Applicant asserts that it has "begun a radio and television campaign in which celebrities advertise the product and the sound mark is played," (briefs, p. 7), but the record contains evidence only of AmberWatch Foundation PSAs, not of product advertisements.[17] Also, while applicant's website invites visitors to click on a link to hear the sound of its product, and refers to the sound as "unique," the record does not reveal how many visitors to the website actually have clicked on the link to listen to the sound. Nor does the website describe the sound or instruct visitors what to listen for if they were to inspect a personal alarm in a store of one of the retailers that sells applicant's product. In fact, there is no indication in the record whether a prospective purchaser of the

---

[17] All of the exhibits applicant refers to as support for its contention that it has begun advertising relate to the PSAs.

product would even be able to listen to its sound when holding a packaged product in a store, or would be able to "click to hear" the sound when shopping for the product on a retailer's website.

Applicant places great reliance on the PSA campaign and the fact that the sound is played in each announcement. However, we agree with the examining attorney that such evidence is not significant. First, it is not at all clear that listeners would perceive the sound, as played in the PSAs, to be anything other than an alarm sound. The PSAs do not refer to the sound as coming from a particular alarm from a particular source or describe the sound as distinctive and explain why it should be considered so.[18] Nor do the PSAs mention applicant in any way.[19] Each PSA ends with an announcer explaining that the announcement was "Brought to you by the AmberWatch Foundation." Under these

---

[18] The PSAs do not even refer to the sound as an alarm sound, although it is likely many listeners will consider it to be such.

[19] Applicant is Vertex Group, LLC, but there is little in the record to associate the AmberWatch product with that company name. The NexTag website references Vertex, but other retailers and applicant's own website refer to AmberWatch and essentially use the name of the product as indicating its source. The limited association of the Vertex name with the product does not prevent the sound from serving as a trademark, for as *General Electric* recognizes, the source of a product differentiated from those of competitors by a sound mark may be an anonymous source. Nonetheless, as discussed above, the PSAs actually associate the sound with a separate entity, the AmberWatch Foundation, rather than applicant.

circumstances, the PSAs do not promote recognition of a distinctive sound but, rather, only awareness that when an alarm sounds, a child may be in danger.[20]

In short, we do not view the PSAs as promoting recognition of the assertedly distinctive nature of the sound or as an indicator of the source of a particular alarm. When listeners hear the closing line "Brought to you by the AmberWatch Foundation" they will not realize that the alarm sound is meant as an indicator of source of a particular product because the sound is not promoted as a distinctive trademark. The PSAs do not mention what the sound comes from, only that it is a sound signaling that a child may be in danger.

In our discussion, infra, regarding the functionality refusal, we will discuss in some detail the alarm sound itself, its characteristics, and how it relates to other alarm sounds. For this discussion of the Section 1, 2 and 45 refusal, however, suffice it to say that alarms, as that term has been defined in the record, are somewhat

---

[20] Applicant and the examining attorney have discussed at some length whether the use of the sound in the AmberWatch Foundation PSAs inures to the benefit of applicant. Such a discussion is appropriate only if the evidence were presented as evidence of acquired distinctiveness which, as explained, is not an issue in these appeals. Since the PSA campaign can only be considered as evidence that the public has been educated as to the assertedly distinctive nature of the sound, it matters not whether such education is conducted by applicant or its related foundation.

ubiquitous.  Applicant has shown this by placing in the record evidence of numerous other producers of personal alarms, all of which are described as loud, and most of which, according to applicant, "utilize differing frequencies and differing arrangements of frequencies,"[21] just as applicant's alarm does.  Sound pulses are not at all an uncommon way for a phone to ring, an alarm clock to sound, an appliance timer to go off, a smoke alarm to signal the possibility of fire, or for any number of other products to provide an audible signal designed to attract attention.  As *General Electric* instructs, "a distinction must be made between unique, different, or distinctive sounds and those that resemble or imitate 'commonplace' sounds or those to which listeners have been exposed under different circumstances."  199 USPQ at 563.  Clearly, alarm sounds consisting of a series of sound pulses, including those at frequency or decibel levels approximating those employed by applicant's alarms, are commonplace and the types of sounds to which prospective consumers of applicant's products would have been exposed in various circumstances.  To state the obvious, every audible alarm emits some sort of sound, many similar to that of

---

[21] See the Request for Reconsideration filed in the child's bracelet application, at pages 4-5.

applicant's product; and we do not find that consumers are predisposed to equate such sounds with the sources of the products that emit them.  See *Wal-Mart Stores,* supra, 54 USPQ2d at 1069 ("In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist.").

We conclude that applicant's sound is the type that *General Electric* instructs may be registered only if "supported by evidence to show that purchasers, prospective purchasers and listeners do recognize and associate the sound with services offered and/or rendered exclusively with a single, albeit anonymous, source."  *General Electric*, supra, 199 USPQ at 563.  The record in these cases does not include such a showing and certainly does not show the sound of applicant's alarms to be so distinctive that it can be registered on the Principal Register without a showing of acquired distinctiveness. The refusal under Sections 1, 2 and 45 is affirmed in each case.

## *Functionality*

The Trademark Act provides that a proposed mark may be refused registration if it "comprises any matter that, as a whole, is functional." Section 2(e)(5), 15 U.S.C. §1052(e)(5).  The Supreme Court has stated "'[i]n general

terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex v. Jacobson*, 34 USPQ2d at 1163-64, quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982). See also, *TrafFix Devices Inc. v. Marketing Displays Inc.*, 523 U.S. 23, 58 USPQ2d 1001, 1006 (2001). We note that this standard contemplates at least two possible bases upon which a finding of functionality may be made. First, if the product feature is essential to the use or purpose of the article it may be found functional. See *TrafFix Devices*, 58 USPQ2d at 1006 ("Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature."). Second, if the product feature affects the cost or quality of the article, so that exclusive right to use it would put a competitor at a disadvantage, this, too, may support a conclusion that the product feature is functional.

The Federal Circuit, our primary reviewing court, looks at four factors, originally set out by a predecessor

court, when it considers the issue of functionality, and the factors are particularly helpful for analyzing functionality under the second approach: (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product. *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 213 USPQ 9, 15-16 (CCPA 1982). See also *Valu Engineering Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1426 (Fed. Cir. 2002).

In the cases at hand, we conclude that the sound proposed for registration is functional and not entitled to registration under either view of functionality. Quite simply, the use of an audible alarm is essential to the use or purpose of applicant's products. It is clear, for example, that applicant touts the loud volume of the sound emitted by its alarm watch (and emphasizes the loudness much more than the flashing LEDs). Similarly, the evidence regarding competitive personal security devices that applicant put into the record also shows the predominant use of loud sound as an alarm. In addition, the sound

27

involves alternating sound pulses and silence, which the CPSC paper and other evidence shows is a more effective way to use sound as an alarm than is a steady sound.

Applicant has argued that it is not seeking to register a sound of any particular loudness. Equally significant, however, is that the description of the sound is not limited to a particular volume. Thus, we must consider it to encompass all reasonable degrees of loudness for an alarm sound. Cf. *Phillips Petroleum Co. v. C. J. Webb, Inc.*, 442 F.2d 1376, 170 USPQ 35, 36 (CCPA 1971) ("Webb's application is not limited to the mark depicted in any special form. In trying to visualize what other forms the mark might appear in, we are aided by the specimens submitted with Webb's application."). Moreover, it is clear from the record that applicant's alarm emits a loud sound and that the loudness of the sound is an essential feature of the product. For example, the specimen of use shows that applicant's sound is typically used in a loud manner. In addition, applicant has admitted "[t]he volume of the alarm is critical." See September 14, 2005 response to office action, child's bracelet application. Indeed, a soft alarm sound would not draw much attention.

In short, the ability of applicant's products to emit a loud, pulsing sound is essential to their use or purpose.

28

For that reason alone, the functionality refusal must be affirmed in regard to each application.  However, we shall also consider the question whether the proposed mark is functional under the *Morton-Norwich* analysis.

The first *Morton-Norwich* factor focuses on whether a utility patent exists disclosing the advantages of the proposed mark.  Applicant argues that it has a utility patent application for its product, not for its sound.  This argument, however, is undercut by the application's focus on a digital wristwatch with a "loud alarm" as an exemplary embodiment for the product, and the application's description of an alarm of 80-125 decibels.  The application does not note the degree of brightness for lights that could potentially be utilized in a visual alarm, or the types of odors that could be used for an olfactory alarm; but it does specify a decibel range for the audible alarm that would be characterized as loud.  Moreover, even if applicant is correct in its argument that the existence of its patent application for its product is not relevant to a *Morton-Norwich* analysis regarding the registrability of its sound, the absence of a patent for the sound would only mean this factor would be neutral in the analysis of functionality.  See *TrafFix Devices*, 58 USPQ2d at 1006, and *In re N.V. Organon*, 79 USPQ2d at 1646.

The second *Morton-Norwich* factor focuses on whether advertising materials tout utilitarian advantages. Applicant's advertising clearly extols the loudness of the alarm sound, much more than the engineering of the product that produces the sound. Applicant has admitted as much. See January 22, 2008 response, child's bracelet application ("the advertising touts the degree of *loudness*")(emphasis in original). The advertising material does not tout the particular frequencies of the sound pulses or the pattern of the pulses, but applicant has admitted "[t]he volume of the alarm is critical." See September 14, 2005 response to office action, child's bracelet application. Thus, applicant's advertising touts a critical feature of its sound, as emitted by the identified goods. This factor favors a finding of functionality.

The third *Morton-Norwich* factor focuses on whether competitors would have functionally equivalent sounds available to them if applicant were accorded the exclusive rights attendant to registration. Of course, as already noted, when a proposed mark has been found functional on other grounds, it is not necessary for the record to also show use of applicant's particular sound would be a competitive necessity. See *Valu Engineering*, 61 USPQ2d at 1427. Nonetheless, it is clear from the record that alarm

sounds work best when they alternate pulses of sound and silence, when the sound pulses fall within a particular range of frequencies, and when the sound is loud. Applicant argues that there are thousands of specific frequencies within the range that is most suitable for use in alarms. That range may be taken as between 1000 and 3000 Hz, based on the information of record. Thus, under applicant's analysis the thousands of frequencies within this range can be combined into countless variations and therefore applicant's particular combination of frequencies need not be employed by other makers of personal alarms. What applicant's argument fails to appreciate, however, is that the description of its mark only specifies that its sound pulses will be between 1500 Hz and 2300 Hz. Based on this description, applicant would be free to combine sound pulses for any of the frequencies within this range, a large swath of the optimal range of 1000 Hz to 3000 Hz. While there may indeed be countless combinations of frequencies available for personal alarms utilizing the frequencies within the optimal range, registration of applicant's sound as described would deprive competitors of many of those options. It matters not that applicant's actual sound may currently use only a handful of particular frequencies, for it would be free to change the

31

combinations at any time and still have its sound fall within the ambit of the description.  This factor favors a finding of functionality.

The final *Morton-Norwich* factor considers whether the sound yields applicant a comparatively simple or cheap method of manufacturing personal alarms.  Applicant has explained, and the record shows, that the sound of its product has no bearing on the cost or ease of manufacture of its alarms.  This factor is neutral.

Weighing all the *Morton-Norwich* factors in the balance, we conclude that the mark applicant has described in its application and proposes to register is functional and unregistrable.  The functionality refusal is affirmed in each application, based on both the *Inwood* formulation of the sound being essential to the use or purpose of applicant's goods and under the *Morton-Norwich* analysis.

*Conclusion*

Both grounds for refusal are affirmed in each of the applications.